COMMONWEALTH *vs.* MICHAEL EUGENE FORRESTER.

Hampden.    February 4, 1974. — March 29, 1974.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions. *Practice, Criminal,* Findings by judge, Capital case. *Waiver. Homicide.*

Denial of a motion to suppress in a murder case did not constitute an abuse of discretion where at the hearing of the motion there was conflicting testimony by two police officers as to whether the defendant was advised of his rights as required by *Miranda* v. *Arizona,* 384 U. S. 436, before or after he made certain statements to the police. [43-44]

Failure by the judge in a murder case to make findings of fact in relation to his denial of a motion to suppress did not in and of itself constitute reversible error. [44-45]

Where, at the hearing of a motion to suppress in a murder case, it appeared that the only finding the judge could have made was that the defendant was advised of his constitutional rights before making statements to the police or that he was not, and where denial of the motion necessarily implied a finding that the defendant had been advised of his rights prior to making such statements, this court was not required to remand the case to the trial judge for further findings. [45-46]

Where, upon review of a murder case under the powers conferred upon this court by G. L. c. 278, § 33E, it appeared that the issue for the jury was one of credibility and that the jury had chosen to disbelieve the defendant's testimony and had found him guilty of murder in the first degree, he was not entitled to the entry of a lesser verdict. [46-47]

INDICTMENT found and returned in the Superior Court on March 3, 1971.

A pre-trial motion was heard by *Sgarzi*, J., and the case was tried before him.

*Efrem A. Gordon* for the defendant.

*John T. McDonough*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J.   The defendant was tried on an indictment charging him with murder in the first degree of Elaine Baker Turner (the victim). The trial was conducted pursuant to G. L. c. 278, §§ 33A-33H, as amended. The jury found the defendant guilty as charged and he was sentenced to life imprisonment.[1] The case is before us on the defendant's appeal based on his assignment of errors.

We briefly review undisputed facts. Early on the morning of February 22, 1971, the body of the victim was found in a parking lot behind a vacant store in the Winchester Square section of Springfield; an autopsy report established that she had died of multiple stab wounds several hours before she was found. About 2:15 A.M. on that same morning, a fireman on duty in a fire station located in Winchester Square and a student living at the station as caretaker had

---

[1] The trial took place in October, 1972, after the United States Supreme Court decision in *Furman* v. *Georgia*, 408 U. S. 238, had been handed down on June 29, 1972. The statutory provision for the death sentence, G. L. c. 265, § 2, as amended by St. 1951, c. 203, was therefore not applied.

seen the victim walk in front of the station and enter an olive green automobile with a flowered vinyl roof and had watched the car drive off down the street. They both had seen and described the driver of the car as a tall black male with dark trousers and a bright shirt. Through investigation, the police discovered that an automobile answering the description given by the fireman and the student was registered in the name of the defendant's wife[2] and that the defendant was in the United States Air Force, stationed at Westover Air Force Base in Chicopee. On February 25, 1971, Detective John J. Sullivan and another officer of the Springfield police department, a Detective Goldthwaite, went to the Westover base with a search warrant for the defendant's automobile. They met the defendant and after a brief discussion about his ownership of the car in question, they asked him to accompany them to the Springfield police station, which he did. His automobile was towed to the station under police orders. After interrogation by Springfield's Deputy Chief James McCarthy at the police station, and after he had made both oral and written statements to the police, the defendant was placed under arrest. He was indicted for the murder of Elaine Baker Turner in March, 1971.

Prior to trial the defendant filed a motion to suppress "any physical evidence obtained from him or from his automobile . . . [and] any oral or written statement, or any evidence obtained directly or indirectly as a result of any such oral or written statement, on the ground that said physical evidence and statements were obtained in violation of the Defendant's Constitutional Rights." His assignment of errors relates entirely to the trial judge's disposition of this motion.[3] We summarize those portions of

---

[2] Although the automobile was actually owned by the defendant's wife, we consider it as the defendant's automobile in this opinion.

[3] When the defendant's motion and the supporting affidavit attached thereto are considered together, it is not clear whether the motion pertained only to allegedly invalid searches of his car and his room or whether it also pertained to statements allegedly obtained from him in violation of his rights protected under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). At the pre-trial hearing on the motion

the pre-trial hearing on the motion and of the trial proceedings which are pertinent to our consideration of the contentions he raises.

The pre-trial hearing took place on October 10 and 11, 1972. Detective Sullivan, called by the defendant as his only witness, testified as follows. On the day that he came to the Westover Air Force Base and transported the defendant to the Springfield police station, February 25, 1971, he had asked the defendant three questions about his car before they left the base, to which the defendant had given answers. Neither he nor Detective Goldthwaite had had any further conversation with the defendant prior to reaching the station. Once the defendant arrived there, further interrogation did take place, conducted by Deputy Chief McCarthy. Sullivan was present throughout this questioning. The deputy chief asked the defendant if he had been in possession of his car on the evening of February 21, 1971, and the defendant proceeded to make several statements concerning his whereabouts that evening, changing his story in the process. He ultimately told the police officers that he had picked up two white men and a white woman late in the evening, that the woman had sat in the front seat and had been bleeding, and that she had said she had been in a fight in a cafe which he knew from her description to be a bar or cafe in Springfield called the Windsor Court. (It was undisputed that the victim was a white woman who worked as a waitress at the Windsor Court.) At that point McCarthy advised the defendant fully of his rights under the *Miranda* decision, inquired into his education, and asked whether he understood those rights. The defendant answered affirmatively and then executed a handwritten statement on a two-page police department form, each page containing at the top a printed notice of the *Miranda* warnings and a printed statement of

both grounds were argued. On appeal to this court the defendant presented only arguments concerning the admissibility of the statements and did not raise any issue about the searches. We resolve any doubt about the original scope of his motion to suppress in favor of the defendant and treat it as including both the statements and searches.

waiver. He signed each page of the form in two places, first below the printed portion and again at the bottom of the page, below his own written statement. McCarthy and Sullivan witnessed his signature.[4] Sullivan was unwavering in his testimony on both direct and cross-examination that the defendant had made several oral statements to the police before the deputy chief informed him of his rights under the *Miranda* decision.

Deputy Chief McCarthy was then called as a witness for the Commonwealth and testified as follows. The defendant was brought into his presence in the detective bureau at the Springfield police station on the afternoon of February 25, 1971, by Detectives Sullivan and Goldthwaite. Before asking him any questions, McCarthy fully informed the defendant of his *Miranda* rights. The defendant said that the "officer in the field" had already told him of these rights and McCarthy said he was nonetheless obliged to repeat them. He then inquired as to whether the defendant understood his rights and asked him about his prior experience. The defendant answered that he had been a high school teacher and that he did understand his rights. McCarthy then asked him about his activities on the night of February 21, 1971, and the defendant gave several conflicting statements in response, the substance of which McCarthy related. His description of the defendant's oral statements was generally, although not entirely, consistent with Sullivan's testimony on the subject. McCarthy and

---

[4] The following is a summary of the defendant's written statement. He left a friend (a woman whose name he gave in his statement) around 10 or 10:30 P.M. on February 21, 1971, and while driving back to the Westover Air Force Base he saw a man who seemed to be having trouble with his car; one other man and a woman were also present in the car, and the two men were white. He stopped to see if the man needed help and then gave all three persons a ride in his own car. The woman was bleeding and looked "like she needed help." She told him that she worked at the Windsor Court Cafe and had been in a fight there. He drove on toward the Expressway and let the passengers out at a turn near by, at their request. The woman passenger left blood on the seat of his car. He washed off the blood that was on the car seat with a piece of a T-shirt which he then threw away. He got back to the base around twelve midnight or after twelve that night. The woman in the car did not have on any shoes or carry a pocketbook. The defendant recognized her "as the girl, who was found dead over by Winsor [*sic*] Court in the paper." He read about her in the newspaper and that was why he did not want to get involved in the matter.

Sullivan then took the defendant down to his car in the police station garage for him to show them the blood he had stated was on the seat. They then returned to the detective bureau, and, at McCarthy's request, the defendant agreed to write out "the true story" for the police. McCarthy got a statement form and, before letting the defendant write on it, repeated to him the *Miranda* warnings and the statement of waiver printed on the top, below which the defendant signed his name. The defendant then wrote down his statement without interruption from the police officers. McCarthy read the statement back to the defendant who then signed it, and McCarthy and Sullivan witnessed his signature.

In addition to the testimony summarized above, evidence was also introduced at the hearing concerning the search of the defendant's car and of his room at the Westover base. At the close of the hearing the judge orally denied the defendant's motion to suppress "except in regard to any interrogation of the Defendant which may have occurred prior to the Miranda warning." He neither made any oral nor filed any written findings of fact. The defendant claimed an exception to the ruling and to the form of the ruling.

The trial began before the same judge the same day as the denial of the defendant's motion. At the trial Deputy Chief McCarthy was permitted to testify to substantially the same information he had given in the pre-trial hearing concerning the *Miranda* warnings and the contents of the defendant's oral statements. The defendant's signed written statement was introduced in evidence. The defendant claimed an exception to the introduction of McCarthy's testimony but did not raise at the trial any question about the timeliness of the *Miranda* warnings given by McCarthy. Detective Sullivan also testified to the defendant's oral statements made to McCarthy and himself, and reasserted that the defendant was not given the *Miranda* warnings until after he had made the oral statements.

The defendant assigns as error the judge's denial of his

motion to suppress the oral and written statements made to the police on February 25, 1971. He states that it was an "abuse of . . . [the judge's] discretion" to disregard Detective Sullivan's account of the interrogation of the defendant in the Springfield police station, particularly with reference to his account of the timing of the *Miranda* warnings, and to "give greater weight and credibility to former Deputy Chief McCarthy whose familiarity with regard to . . . [the interrogation proceedings] was demonstrably less accurate than the recollection and account of Detective Sullivan." He also assigns as error the judge's failure to submit a report of material facts or findings in relation to his denial of the motion.

1. Since the United States Supreme Court's decision in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), it is clear that the admissibility of any statements made by a defendant as a result of custodial interrogation by the police depends on his having first received from them instructions or warnings which satisfy the requirements set forth in the *Miranda* opinion. This rule obtains whether the statements are termed "confessions" or "admissions." 384 U. S. at 444, 476-477. "The *Miranda* case provides safeguards to the privilege against self-incrimination by requiring that explicit instructions be given to a person in custody on the right to the assistance of counsel. In brief, these safeguards require that the person who is in custody for interrogation must, first, be told of his right to be silent and his right to the assistance of counsel; and, second, be afforded the opportunity to exercise these rights throughout the interrogation . . . [footnote omitted]. The second is as important as the first. The duty to do both is on the police, and, when challenged, the burden is on the prosecution to show that both have been done. The stated rights continue throughout the interrogation; they may be waived, but they cannot be forfeited." *Commonwealth* v. *McKenna*, 355 Mass. 313, 323-324 (1969).

The defendant does not argue that he never received his *Miranda* warnings at any point during the police inter-

rogation. Nor does he raise on appeal an argument that he did not make a knowing and intelligent waiver of his privilege against self-incrimination which such warnings are intended to protect. Cf. *Commonwealth* v. *Murray*, 359 Mass. 541, 545-546 (1971); *Commonwealth* v. *Cain*, 361 Mass. 224, 227-228 (1972). His only contentions are that the Commonwealth has failed to sustain the burden placed on it to show that the warnings were seasonably given and that the judge's finding that they were so given is not supported by the weight of the evidence and "amounted to an abuse of discretion." We cannot agree.

The basic issue before the judge at the hearing on the defendant's motion to suppress was a question of credibility. Deputy Chief McCarthy's testimony, if believed, would tend to support the Commonwealth's contention that the required *Miranda* warnings were given to the defendant and that his *Miranda* rights were understood and waived by him prior to his making any statements to the police, thereby rendering both oral and written statements admissible at trial. Detective Sullivan's testimony, if believed, would tend to support the defendant's contention that all his statements were inadmissible because the police failed to give him the required warnings in timely fashion. As the trier of fact who heard and saw the witnesses, it was the trial judge's responsibility to resolve the conflicts in the two officers' testimony. He was not bound to believe Detective Sullivan's account of the timing of the *Miranda* warnings. We cannot say on appeal that the judge's denial of the defendant's motion to suppress was an "abuse of discretion" as claimed by the defendant. *Commonwealth* v. *Rogers*, 351 Mass. 522, 528-529 (1967). *Commonwealth* v. *Femino*, 352 Mass. 508, 512-513 (1967). *Commonwealth* v. *Wilson*, 360 Mass. 557, 564 (1971). See *Commonwealth* v. *Murphy*, 362 Mass. 542, 547 (1972).

2. The defendant also assigns as error the judge's failure to make or file findings of fact in relation to his denial of the motion to suppress. We said in *Commonwealth* v. *Cook,*

351 Mass. 231, 234 (1966), cited by the defendant, and we reiterate here that it is both "prudent" and "desirable" for a judge to make a record of facts found in a voir dire hearing on the admissibility of evidence or in a pre-trial motion to suppress. However, the *Cook* case did not set down as an absolute requirement that such a record be made, and failure to do so does not in and of itself constitute reversible error. See *Jackson* v. *Denno*, 378 U. S. 368, 378-379 and fn. 8 (1964); *Helmick* v. *Cupp*, 437 F. 2d. 321, 323 (9th Cir. 1971), cert. den. 404 U. S. 835 (1971).

The trial judge in this case has since left the bench pursuant to Part II, c. 3, art. 1, as amended by art. 58 of the Amendments to the Constitution of the Commonwealth requiring that judges retire on reaching the age of seventy years. Therefore, although his oral denial of the defendant's motion to suppress was not so precise as it might have been, we cannot remand the case for him to make a record of his findings of fact with respect to such denial, as was done in such cases as *Commonwealth* v. *Tempesta*, 361 Mass. 191, fn. 1 (1972), *Commonwealth* v. *Murphy*, 362 Mass. 542, 544 (1972), both of which involved motions to suppress identification evidence, and *Jackson* v. *Denno, supra*, at 394-396. In this case, however, both police officers testified at the hearing that the defendant did receive the *Miranda* warnings and the only real conflict in their testimony was as to the time such warnings were given. It thus seems clear that the only finding the judge could have made was either that the defendant was informed of his *Miranda* rights before McCarthy's interrogation in the police station began or that he was not. The judge's subsequent admission in evidence of the defendant's written statement and of McCarthy's and Sullivan's testimony about the defendant's oral statements necessarily implies a finding that the defendant did receive his *Miranda* warnings prior to any in-custody interrogation. We therefore conclude that we would not have been required to remand the case for findings even if the trial judge were available. See *Jackson*

v. *Denno, supra,* at 378-379 and fn. 8; *Sims* v. *Georgia,* 385 U. S. 538, 544 (1967).

3. On motion of his counsel, the defendant's trial was conducted pursuant to G. L. c. 278, §§ 33A-33G, as amended. On appeal the defendant's counsel has not requested that we review the case under the powers conferred on us by G. L. c. 278, § 33E, nor even mentioned the extraordinary power of review provided under that section. See *Commonwealth* v. *Cox,* 327 Mass. 609, 614 (1951). Argument by counsel on this point would have been helpful both to the defendant and to the court. Nevertheless, we have read the entire transcript of the defendant's trial and have studied the law and the evidence contained therein as mandated by § 33E. We do not find that the verdict was against the law or the weight of the evidence.

The defendant's testimony at trial concerning his actions on the night the victim was killed conflicted in several respects with his written statement to the police, introduced as an exhibit at the trial, and with McCarthy's and Sullivan's testimony as to his oral statements.[5] Moreover, both officers testified that the defendant changed his story several times in the course of making such oral statements, and they described the substance of the changes. The jury were entitled to infer from the defendant's conflicting and changing accounts of his actions some consciousness of guilt. There was also testimony from other witnesses which, if believed, tended to show that the

---

[5] For example, the defendant testified at the trial that he spent the evening of February 21, 1971, with a woman he identified as his girl friend, leaving her apartment about 12:30 A.M. on February 22; and that around 2:15 A.M. that morning he picked up the victim, who was alone, in the Winchester Square area of Springfield and gave her a ride to a particular restaurant in the city, where she got out. In his written statement, summarized above at fn. 4, the defendant said that the victim was with two white men when he picked her up in his car, and that he had given a ride to all three persons and had left them off together near the Expressway; he made no reference to his girl friend, but had mentioned a woman who was in fact her sister. At the trial he testified that he had given the statement about the two men accompanying the victim to protect himself; he said that he was afraid the police might charge him with the crime of "reckless eyeballing" because he had been alone in a car with a white woman, a possibility which he knew to be very real in the South where he had grown up. He also testified that he had not mentioned his girl friend's name to the police to protect her from becoming involved in the case.

defendant had met the victim at the Windsor Court Cafe
before the night she was killed; that he had been at the cafe
with her on the night she was killed; that he had borrowed a
knife from another airman at the Westover base about ten
days before the victim's death; that he had never returned
the knife but had told another friend the evening after the
death that he had lost it and would have to replace it; and
that he was noticeably interested in obtaining and reading
area newspapers the day after the killing occurred. The
defendant denied the truth of such testimony and gave a
contradictory account of his actions before and after the
night of the victim's death. The issue for the jury was one of
credibility, and they were free to disbelieve the defendant's
testimony. We are constrained to hold that nothing in our
review of the case convinces us that the defendant is
entitled to the entry of a lesser verdict.

*Judgment affirmed.*