NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10993


COMMONWEALTH  vs.  SCOTT FOXWORTH.



Middlesex.     September 11, 2015. - November 12, 2015.

Present:  Gants, C.J., Spina, Botsford, & Duffly, JJ.


Homicide.  Conspiracy.  Constitutional Law, Conduct of
    government agents.  Evidence, Conversation between husband
    and wife, Threat, Prior conviction, Relevancy and
    materiality, Immunized witness.  Practice, Criminal,
    Capital case, Motion to suppress, Conduct of government
    agents, Argument by prosecutor, Instructions to jury,
    Agreement between prosecutor and witness.  Witness,
    Immunity.




    Indictments found and returned in the Superior Court
Department on June 26, 2006.

    A pretrial motion to suppress evidence was heard by Leila
R. Kern, J., and the cases were tried before her.


    Kenneth I. Seiger for the defendant.
    Bethany Stevens, Assistant District Attorney, for the
Commonwealth.

SPINA, J. The defendant was convicted of deliberately premeditated murder and conspiracy to commit murder.[1] On appeal he challenges (1) the denial of his motion to suppress statements he made to a jailhouse informant whom he alleged to be an agent of the Commonwealth; (2) the admission in evidence, allegedly in violation of the spousal disqualification rule, of statements his alleged coconspirator made to the coconspirator's spouse; (3) the admission in evidence of his prior incarceration; (4) a statement by the prosecutor in closing argument that the defendant contends was improper comment on his right not to testify; and (5) the adequacy of the judge's instruction concerning the jury's consideration of the testimony of an immunized witness. The defendant also urges us to grant him a new trial pursuant to our powers under G. L. c. 278, § 33E. We affirm the convictions and decline to reduce the degree of guilt or order a new trial.

1. Background. The jury could have found the following facts. We reserve other details for discussion of the issues. On January 13, 2006, at approximately 7:45 A.M., the defendant shot the victim in the head shortly after the victim arrived at the parking garage at his place of employment in Newton, killing

---

[1] The defendant consented to the joinder for trial of the separate indictments alleging murder and conspiracy to commit murder. Although this did not strictly comply with Mass. R. Crim. P. 9 (e), 378 Mass. 859 (1979), as he did not himself file a motion for joinder, the import of his consent is the same.

him.  This was a contract killing in which the defendant was hired by James Brescia to kill the victim, who had been dating Brescia's wife, Stacey Rock.[2]

The victim had dated Rock when they were in high school and in college, before she married Brescia.  Their relationship ended in 1996.  Rock and Brescia were married in 1998.  Rock and the victim renewed their relationship in June, 2005.  Brescia had been aware of their past relationship.  He learned that they were seeing one another after he discovered a letter the victim wrote to Rock, and after he found the victim's cellular telephone in Rock's purse.  On July 28, 2005, Brescia was served with divorce papers.

There were several confrontations between Brescia and the victim.  At one point Brescia told his wife that if she and the victim ended up together, "it wouldn't be good for [the victim's] health," he would not be the one to do it, and it would not be traceable to him.  Brescia was ordered to vacate the marital home.  That, together with the divorce proceedings, upset him greatly.  On the day that the order to vacate issued, he moved into his mother's home in Waltham and called the victim from a pay telephone.

---

[2] James Brescia was convicted of murder and conspiracy to commit murder.  His motion for a new trial was allowed, and we upheld the order granting a new trial.  See Commonwealth v. Brescia, 471 Mass. 381 (2015).

Brescia had learned of the defendant through Nancy Campbell, a coworker of Brescia's. Brescia learned through Campbell that the defendant had an extensive criminal record, that he had served time in prison for murder, and that he had offered to beat Campbell's husband when she had been embroiled in divorce proceedings. Brescia asked Campbell for the defendant's contact information. He told her he wanted to hire the defendant to beat the victim. In early October, 2005, Brescia hired the defendant to beat the victim for $5,000. Brescia told the defendant he would communicate with him by pay telephone, to avoid being traced.

The defendant began surveillance of the victim on October 9, 2005, starting with his home in Framingham. On October 14, Brescia met the defendant and paid him $4,000. The defendant enlisted a friend, James O'Neil, to help him. O'Neil and the defendant conducted surveillance of the victim at his place of employment and at his home during November and December. Brescia visited the defendant at his home in Dracut on November 9 and 20. Brescia communicated by pay telephone with the defendant over thirty times in December.

After an upsetting visit with his wife and children on Thanksgiving Day, Brescia expressed to Campbell his anger and hatred toward the victim. He said that if the victim were dead, he would be able to repair his relationship with his wife. He

told Campbell that a beating would not suffice, and that he wanted the victim out of the picture. Brescia offered the defendant an additional $5,000 to kill the victim and entrusted that amount to a friend, Charles Merkle, to hold until Brescia needed it. He met with Merkle at some time in December and obtained $2,500. The defendant bought expensive gifts for Campbell's children for Christmas, 2005. When Campbell mentioned this to Brescia, Brescia said, "[O]h, that's where my money went."

Brescia spent about two weeks with his wife and children over the Christmas holiday. He and his wife were intimate, but she remained set on divorce. He expressed his frustration to his wife's sister, telling her he was "out of [his] mind" about being pushed away. Furious that the victim was making Brescia's wife choose between them, Brescia repeated his frustration to his wife's sister in electronic mail (e-mail) messages sent during the days before the murder. During this same period he communicated with the defendant by pay telephone six times. On January 11, 2006, Brescia sent an e-mail message to his wife's sister, writing that his "heart [was] in [his] stomach" over the fact that the two weeks he spent with his wife over the holidays had "mean[t] nothing." On January 12, Brescia telephoned the defendant. The call lasted four and one-half minutes. The victim was murdered the next morning.

The defendant was held in lieu of bail pending trial. At one point he shared a cell with an inmate who later informed against him. He confided in this inmate about the murder and admitted his involvement. He told the inmate that he could help the inmate make bail so that the inmate could do whatever it took to prevent Campbell from testifying against him. He also told the inmate about a map he had used that had the murder scene highlighted, which he wanted the inmate to locate before police discovered it.

2. <u>Motion to suppress</u>. The defendant argues that the judge erred in denying his motion to suppress statements he made to the inmate, whom he alleges was an agent of the Commonwealth at the time the statements were made. The defendant contends that the statements were admitted in evidence in violation of the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. To support his claim, the defendant relies upon the theory of "implicit" agency relationship and the conduct of the parties. Specifically, the defendant relies on the inmate's intention to benefit from providing information about the defendant to police, the Commonwealth's orchestration of a reduction in a sentence the inmate received in the Superior Court in Barnstable County, the orchestration of a reduction in the inmate's bail in a case in the Superior Court in Suffolk

County, and the orchestration of a supplemental plea agreement in the United States District Court for the District of Maine in which Federal prosecutors agreed to bring to the attention of the Federal judge the inmate's cooperation with the Middlesex County district attorney's prosecution of the defendant for the purpose of forming a basis for a downward departure from the minimum sentence he was expected to serve. In addition, the defendant contends that after the inmate presented his information to the State police assigned to the Middlesex County district attorney's office, he was returned to the cell he shared with the defendant, thereby implicitly encouraging him to obtain and provide further information in exchange for the benefit he desired.

We summarize the evidence presented at the hearing on the motion to suppress. The judge denied the motion, but she made no written findings. There is no affidavit from the defendant, and the defendant did not testify at the hearing on his motion to suppress. Trial counsel represented to the motion judge that the facts were largely not in dispute, but that he would be asking the judge to draw inferences from the facts. Although it is both prudent and desirable for a judge to make written findings when deciding a motion to suppress, the failure to do so does not always constitute reversible error. See Commonwealth v. Forrester, 365 Mass. 37, 45 (1974). Where the

ultimate conclusion is clearly evident from the record, the failure to make written findings is not fatal. See Commonwealth v. Lanoue, 392 Mass. 583, 586 n.2 (1984), S.C., 400 Mass. 1007 (1987), and S.C., 409 Mass. 1 (1990); Forrester, supra. Neither party asserts error in the judge's failure to make findings.

The following facts are undisputed. On March 3, 2006, the inmate was arrested in Maine on a fugitive warrant for armed robberies alleged to have been committed during 2005 and 2006 in Suffolk County, Massachusetts. He waived rendition and was remanded to State custody at the Old Colony Correctional Center (Old Colony), pursuant to G. L. c. 276, § 52A, having been incarcerated previously at a State institution upon conviction of a felony. In April, 2006, the defendant was arrested on charges of murder and conspiracy complaints in the instant case. He thereafter was remanded to State custody at Old Colony, pursuant to G. L. c. 276, § 52A. Both the inmate and the defendant were held at Old Colony from on or about April 11, 2006, until January 11, 2008, when the inmate was transferred to the Massachusetts Correctional Institution at Concord (MCI-Concord). During that time they were cell mates for approximately six to eight months.

The inmate was arraigned on May 5, 2006, in the Superior Court in Suffolk County on indictments alleging armed robbery and conspiracy. He was arraigned on November 9, 2006, in the

Superior Court in Barnstable County on an unrelated indictment alleging receiving stolen property having a value of $250 or more. The inmate arranged for a letter to be sent to the prosecutor assigned to the defendant's case. The letter was postmarked November 17, 2006. In the letter, the inmate indicated that he had obtained information from the defendant while they were both held at Old Colony. The letter included details about how the defendant had murdered the victim, how he had disposed of the murder weapon, the existence of a map of the murder scene and the victim's home, the involvement of O'Neil, and money paid to O'Neil. The inmate was not the first person to come forward with information obtained from the defendant while he was being held. Two other inmates previously had come forward. Both were interviewed, and one was interviewed a second time. However, nothing came of either inmate's information. In the case of the inmate interviewed twice, he was released before any agreement could be reached.

State police Sergeants William Donoghue and Kerry McHugh arranged a meeting with the inmate and his attorney on March 15, 2007, at the Superior Court in Suffolk County. The prosecutor was unable to attend. Donoghue began the meeting with a statement to the inmate that they had no authority to enter into any agreements, and that they were making no promises, inducements, or rewards. The inmate indicated that he

nevertheless was willing to speak to them at that time.  The meeting lasted between forty-five minutes and one hour.  Donoghue took notes, and he prepared a report that was provided to the defendant.  At the end of the meeting, Donoghue said he would pass along to the district attorney the information the inmate had provided.  He told the inmate not to question the defendant on behalf of the Commonwealth, and that the inmate was not their agent.  Donoghue turned to the inmate's attorney for acknowledgment that these limitations were understood, and counsel so acknowledged.  Also at the end of the meeting, the inmate made known that he was looking for some nonspecific favorable treatment in his Suffolk County case in exchange for the information he provided.  He was not looking for consideration in his Barnstable County case.  Donoghue told the inmate and the inmate's attorney that he would get back to them.  Donoghue made no comment to the inmate about the value of the inmate's information to the Commonwealth.  Donoghue returned to the Middlesex County district attorney's office and passed along the information to assistant district attorney Adrienne Lynch, the prosecutor in Foxworth's case, and to first assistant district attorney John McEvoy.

A second meeting with the inmate and his attorney took place on October 17, 2007, at the Superior Court in Suffolk County.  Assistant district attorney Lynch, State police Trooper

Kevin Baker, the inmate, and his attorney were present. There had been no contact between anyone connected with the Middlesex County district attorney's office and the inmate since the first meeting. At the beginning of the meeting Lynch told the inmate that neither she nor the officers had authority to make any promises or agreements. The inmate proceeded to state in his own words the same information he previously had provided. He provided a few additional details in response to questions asked by Lynch and Baker that sought clarification of previously provided information. Baker took notes and prepared a report that was provided to the defendant in discovery. At the end of the meeting, and once during the meeting, Lynch told the inmate they did not want him talking to anyone or asking anyone any questions on their behalf. He was told not to get any more information from the defendant. However, because they were cell mates at that time, he could not avoid talking about the case with the defendant because the defendant frequently brought it up without any prompting. The inmate did not initiate any of the discussions, but he asked some questions even after being told not to do so. His goal was not to continue to obtain information from the defendant. He did not think he needed to provide any more information, or that the information he previously had provided was inadequate. No one ever suggested he needed to get more information, or specific information. At

the end of the second meeting the inmate was asked what he expected from his cooperation. He said that he hoped it would help him out. He was told they would try to corroborate the information he had given, and discuss the matter with the decision makers at the Middlesex County district attorney's office.

On November 13, 2007, the inmate pleaded guilty in the Superior Court in Barnstable County to the crime of receiving stolen property. He was sentenced to the Massachusetts Correctional Institution at Cedar Junction for a term of not less than two and one-half years and not more than two and one-half years and one day. On November 16, 2007, he was indicted by a Federal grand jury in Maine in connection with his possession of a firearm at the time of his arrest in March, 2006, on the fugitive warrant. He was indicted as an armed career criminal in possession of a firearm. The Federal guidelines called for a range of sentence between thirty years and life.

On January 11, 2008, the inmate was transferred from Old Colony to MCI-Concord, as he was then serving a State prison sentence ordered by the Superior Court in Barnstable County.

On February 24, 2008, Merkle corroborated information provided by the inmate that was not known by police, specifically, information about payments before and after the

murder.  Merkle testified about that information at Brescia's trial in June, 2008.  Information provided by the inmate concerning the payments was further confirmed by cellular telephone tower records showing the telephones of Merkle, Brescia, and the defendant all transmitting near the location of the final payment made on January 15, 2006.

On June 27, 2008, the inmate's Barnstable County sentence was revised and revoked.  The sentence was reduced by six months based on support from Middlesex County and Suffolk County prosecutors.  On July 3, 2008, the inmate's bail in the Superior Court in Suffolk County was reduced to personal recognizance so that he could be turned over to Federal authorities in Maine under the Federal detainer that had been lodged against him.  On August 20, 2008, he pleaded guilty in the United States District Court for the District of Maine on the indictment charging him as an armed career criminal.  He was not sentenced at the plea hearing, but he signed a supplemental plea agreement acknowledging that there was no specific agreement with Federal prosecutors as to what, if any, consideration would be given in exchange for his cooperation in the prosecution of the defendant (Foxworth), but that if he did cooperate, his cooperation would be brought to the attention of the Federal District Court, and that such cooperation could serve as a basis for a downward

departure from the thirty-year minimum Federal sentence he was facing.

On September 8, 2008, Sergeant Donoghue and Trooper Baker went to Maine to speak to the inmate. His Federal defense counsel was present. The purpose of the meeting was to determine if the information the inmate previously had given was consistent with his present memory, to make him aware that he would have to testify at the defendant's trial before anyone in the Middlesex County district attorney's office would inform Federal prosecutors that he had cooperated in the defendant's prosecution, and to determine whether he was willing to cooperate. The inmate's information remained generally consistent. He provided some additional, clarifying details, and corrected some information previously provided. No promises were made by the officers.

The Sixth Amendment guarantees an accused the right to counsel upon the commencement of formal adversary proceedings. Brewer v. Williams, 430 U.S. 387, 401 (1977). Thereafter, government agents may not "deliberately" elicit statements from a defendant outside the presence of counsel. Massiah v. United States, 377 U.S. 201, 206 (1964). Any evidence obtained in violation of this rule must be suppressed. See Maine v. Moulton, 474 U.S. 159, 172-176 (1985). Article 12 provides at least as much protection in this case as does the Sixth

Amendment.   See Commonwealth v. Murphy, 448 Mass. 452, 465-467 (2007).

This rule applies not only to overt interrogation by government officers, but also to "indirect and surreptitious" interrogation by persons acting as government agents.  See Commonwealth v. Harmon, 410 Mass. 425, 428 (1991), quoting Massiah, supra.  Indirect interrogation need not involve actual questioning, but it does require "some action, beyond mere listening, that was designed deliberately to elicit incriminating remarks."  Murphy, supra at 463, quoting Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

Whether someone is an agent of the government for purposes of the Sixth Amendment and art. 12 depends on the circumstances of each case.  One who is paid by the government for incriminating evidence and who "deliberately elicit[s]" statements from a defendant acts as an agent of the government. See United States v. Henry, 447 U.S. 264, 271 (1980).  One who receives a promise of the recognition of cooperation and thereafter "deliberately elicits" incriminating evidence from a defendant acts as an agent of the government.  See Commonwealth v. Reynolds, 429 Mass. 388, 394 & n.7 (1999).  Benefits promised to someone pursuant to a cooperation agreement need not be conferred directly by the prosecuting authority, and may include arrangement of benefits through a different prosecuting

authority. See Murphy, 448 Mass. at 465. An agency relationship may arise other than by express agreement, and may "evolve[] by implication from the conduct of the parties." Theos & Sons v. Mack Trucks, Inc., 431 Mass. 736, 743-744 & n.13 (2000). However, someone "who has not entered into any agreement with the government, and who reports incriminating evidence to police out of conscience or even 'an unencouraged hope to curry favor' is not acting as a government agent." Reynolds, supra at 393 (citation omitted). See Harmon, 410 Mass. at 428. "An individual's actions will not be attributed to the State if no promises are made for that individual's help and if nothing was offered to or asked of that individual" (emphasis added). Id., quoting Commonwealth v. Rancourt, 399 Mass. 269, 274 (1987). See Reynolds, supra.

There was no evidence in this case from which a reasonable inference could be drawn that the inmate was an agent of the Commonwealth under a theory of implied agency. The inmate was told repeatedly and consistently by those who interviewed him that they had no authority to enter into any agreement with him, that no promises were being made, and that he had no authority to act on behalf of the Commonwealth to obtain information from the defendant. There is no suggestion that the inmate was given something of value, such as money. The evidence in this regard was uncontradicted. Even if the judge disbelieved this

testimony, such disbelief could not provide a basis to support a contrary finding that a promise had been made. Nor was there any evidence to support an inference that the Commonwealth had promised anything to the inmate. Absent a promise made to the inmate, there was no basis for determining that he was an agent of the Commonwealth for purposes of the Sixth Amendment. See Reynolds, 429 Mass. at 394 & n.7; Harmon, 410 Mass. at 428; Rancourt, 399 Mass. at 274.

The fact that arrangements had been made during the summer of 2008 to facilitate the inmate's transfer to Federal custody (his Barnstable County sentence had been revised and revoked, and his bail in his Suffolk County case had been reduced to personal recognizance), well after he had moved out of Old Colony, where the defendant was being held, is immaterial. Absent evidence that such treatment had been promised in exchange for information yet to be obtained, the mere fact that his Barnstable County sentence had been revised and revoked, or his Suffolk County bail reduced, does not establish an agency relationship. See Rancourt, supra.

The defendant argues that the Commonwealth exploited the fact that the inmate shared a cell with the defendant and that he would likely obtain additional information when the inmate was returned to his cell after the March and October, 2007, meetings. Absent evidence of a promise, express or implied, as

an inducement to obtain more information about the defendant, the defendant has failed to establish the essential fact of agency.  See Harmon, 410 Mass. at 430 (absent evidence of promise by government, statement that inmate "keep his ears open" after returning to prison, and after having come forward with information about defendant, does not suffice to establish agency relationship).

The inmate also had been told that the officers would have to verify the information he provided, and that they would get in touch with him and his lawyer.  The inmate did not know, based on his personal knowledge, that the information he provided was accurate.  He could only pass along what the defendant had told him.  The inmate had to understand that the Commonwealth was in no position to promise him anything unless and until the information could be verified and that it was useful to the Commonwealth to some significant degree.

We conclude that there was no error in the denial of the defendant's motion to suppress.

3.  Spousal disqualification.  The defendant contends that Brescia's wife's testimony about statements Brescia made to her that he was going to "snap [the victim's] scrawny neck," that if she ended up with the victim it "wouldn't be good for [the victim's] health," and that whatever happened to the victim "won't get back to me" were erroneously admitted in evidence in

violation of G. L. c. 233, § 20, which prohibits spouses from testifying "to private conversations with the other."  There was no objection to the testimony, so our review is limited to a review under the standard of a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).  Because the Brescia children were present during the conversation, the statutory rule of disqualification does not apply.  See Commonwealth v. Stokes, 374 Mass. 583, 595 & n.8 (1978); Freeman v. Freeman, 238 Mass. 150, 161 (1921).  In addition, and regardless of the presence of others, threatening statements such as those before us will not be deemed "private conversations."  Commonwealth v. Burnham, 451 Mass. 517, 523 (2008).  There was no error.

4.  The defendant's prior prison sentence.  The defendant asserts error in the admission of evidence that he had served a prison sentence between 2002 and 2005.  He contends that the prejudicial impact of this evidence outweighed its probative value.  Because the defendant objected, we review under the prejudicial error standard.  Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

"Evidence of a defendant's prior incarceration may be admitted if it is offered for a relevant purpose other than to show the defendant's criminal propensity or bad character, and

if the probative value of its relevant purpose outweighs the risk of unfair prejudice." Commonwealth v. Brown, 462 Mass. 620, 628 (2012). See Commonwealth v. Helfant, 398 Mass. 214, 224-225 (1986). The decision to admit such evidence is committed to the sound discretion of the judge. Commonwealth v. Sharpe, 454 Mass. 135, 143 (2009). The evidence was highly relevant, and the judge went to great lengths to minimize the potential for prejudice.

The evidence came in through the testimony of the defendant's landlord, and through the testimony of Campbell. The landlord testified that he held power of attorney for the defendant's benefit while the defendant was incarcerated. He opened a joint bank account he held with the defendant. The joint account was used to handle the defendant's finances while he was incarcerated under sentence, and again while he was being held on the murder indictment. As such, the landlord was aware of the defendant's finances, and he explained that he did not make the $1,000 deposit to the joint account on October 15, 2005. Other evidence showed that Brescia met the defendant for the first time on October 14 and gave him $4,000 in cash. Brescia had had his mother cash his $4,459 tax refund check because he did not want to cash it at his bank. He used this money to pay the defendant the $4,000. This evidence was relevant to the defendant's financial motive in the conspiracy

with Brescia, as well as his motive to commit the murder. Although evidence of the defendant's prior incarceration may not have been necessary to the landlord's testimony about the defendant's finances, its admission in evidence was not an abuse of discretion, especially in light of its relevance to Campbell's testimony, to which we turn.

The fact of the defendant's prior incarceration also was relevant to the nature and history of the defendant's relationship with Campbell, and the circumstances under which he first met Brescia. The defendant was someone Campbell knew and who offered to beat her former husband during their divorce. Campbell had informed Brescia about the defendant's criminal history, which Brescia recognized as a credential for the resources he wanted.

The judge minimized the potential for prejudice through several measures. First, she conducted an individual voir dire of potential jurors and excused those jurors who were unable to remain fair and impartial knowing that the defendant previously had been incarcerated. Second, the judge excluded all reference to the crime for which the defendant previously had been incarcerated (murder in the second degree), both during the jury selection process and during the presentation of evidence. Finally, the judge instructed the jury at the end of the trial that they could not consider the defendant's prior incarceration

for propensity purposes. We add that the prosecutor wisely avoided any direct reference to the defendant's prior incarceration during closing argument. We are satisfied that the matter was handled with utmost sensitivity, and that there was no abuse of discretion.

5. Prosecutor's closing argument. During closing argument the prosecutor said the inmate "got the details of the crime from the only living witness to the murder . . . Scott Foxworth." Trial counsel objected on the ground that this was improper comment on the defendant's failure to testify. The issue is preserved, so our review is under the prejudicial error standard. Flebotte, 417 Mass. at 353. We review to consider whether a prosecutor's remark is "reasonably susceptible of being interpreted as a comment on the defendant's failure to take the stand." Commonwealth v. Pena, 455 Mass. 1, 19 (2009). The remark will not be considered in isolation, but in the context of the entire closing argument. Id.

Here, more than half of defense counsel's closing argument was devoted to why the jury should disbelieve the inmate's testimony. He repeatedly argued that the details did not come "from Mr. Foxworth's mouth." In her closing argument, the prosecutor addressed the defense claim that the inmate got his information by reading the discovery materials that had been provided to the defendant. She argued that the inmate had

included in his letter to the Commonwealth in November, 2006, details about the murder contained in discovery materials the defendant had not yet seen, and other details that the police did not yet know.  The prosecutor then stated in her closing that the inmate "got the details of the crime from the horse's mouth.  He got the details of the crime from the only living witness to the murder . . . Scott Foxworth."  She continued in that vein, identifying the various pieces of evidence that the inmate could not have learned from discovery materials, but from one source alone, the defendant, and that those pieces of information were later corroborated by police and led to substantial evidence of guilt.

We are satisfied that a reasonable jury would not have understood the isolated quote from the prosecutor's closing argument to have been a comment on the defendant's failure to testify, but analysis showing that the defendant himself was indeed the source of the inmate's information.  There was no error.

6.  <u>Instruction on immunized witness</u>.  Campbell testified pursuant to a grant of immunity.  The judge instructed the jury that the defendant could not be convicted solely on the testimony of an immunized witness.  The defendant acknowledges that this was a correct statement of law, but he asserts that the charge as a whole was inadequate because it failed to

instruct the jury that they should scrutinize the testimony of an immunized witness with great care, and also failed to instruct that the government was not vouching for the witness's truthfulness. See Commonwealth v. Ciampa, 406 Mass. 257, 263-264 (1989). The defendant objected to the absence of a "great care" instruction. Our review is under the prejudicial error standard. Flebotte, supra. He did not object to the absence of a "nonvouching" instruction. Our review of that assertion of error is under the standard of a substantial likelihood of a miscarriage of justice. Wright, 411 Mass. at 682.

The judge instructed the jury conformably with Commonwealth v. Dyous, 436 Mass. 719, 727 & n.11 (2002). That is all that is required where, as here, Campbell's credibility had been vigorously impeached and the prosecutor elicited only once during the trial, during her direct examination of Campbell, that she was subject to prosecution for perjury if she did not testify truthfully, and never brought up during her closing argument Campbell's obligation to testify truthfully. The judge's general credibility instruction and her instruction that a guilty verdict could not rest solely on the testimony of an immunized witness were sufficient in the circumstances of this case. We acknowledge that the instructions that were not given here might be useful where the prosecutor does emphasize repeatedly the immunized witness's obligation to tell the truth,

see Commonwealth v. Webb, 468 Mass. 26, 35 (2014); Commonwealth v. Brousseau, 421 Mass. 647, 654-655 (1996), but that did not happen in this case.  There was no error.

7.  Review under G. L. c. 278, § 33E.  We have reviewed the entire record, the transcripts, and the briefs, and discern no reason to exercise our powers to grant a new trial or reduce the degree of guilt.

Judgments affirmed.