******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MULLINS, J., concurring in part and dissenting in part. I respectfully disagree with part I of the majority opinion[1] because, in my view, there is ample support in the record for the trial court's factual finding that Kenneth Pladsen, Jr., was not acting as an agent of the state when he elicited certain incriminating statements from the defendant, Lazale Ashby. Accordingly, I would conclude that the trial court correctly denied the defendant's motion to suppress those statements because the state did not obtain them in violation of the defendant's sixth amendment right to counsel under *Massiah* v. *United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). I would therefore affirm the defendant's convictions stemming from the December 1, 2002 murder of the victim.[2]

Consistent with the majority of jurisdictions across the country, this court has recognized that an informant who obtains incriminating information from a defendant is not an agent of the state for purposes of *Massiah* unless the state had expressly or implicitly directed the informant to obtain information, or offered the informant some type of benefit in exchange for information. See, e.g., *State* v. *Swinton*, 268 Conn. 781, 858, 847 A.2d 921 (2004) (jailhouse informant was not state agent when he obtained information without having been directed to do so or offered reward). Pladsen's testimony at the suppression hearing, which this court is bound to accept on appeal because the trial court explicitly credited it, establishes that these requirements are not present in this case.

Pladsen testified that, during his single meeting with Detective Andrew Weaver of the Hartford Police Department on January 5, 2007, (1) Weaver never instructed him to obtain information from or do "anything relative to" the defendant, (2) he and Weaver made no "agreement of any sort," (3) it was not "implied" to him that he should obtain information, and (4) Weaver made "very clear" he was not offering any benefits or deals and, in fact, lacked the authority to do so. Pladsen further testified that his subsequent decision, made several months later, to obtain the incriminating statements from the defendant was one that he made "on [his] own," rather than in response to any directive from Weaver, and that he did so on the "spur of the moment" when "the opportunity presented itself . . . ." This testimony provides ample—if not overwhelming—support for the trial court's finding that Pladsen was not a state agent.

This case also lacks any of the other circumstances typically characteristic of an agency relationship. The state had no preexisting arrangement with Pladsen or any plan to use his services. Pladsen had no history of

serving as an informant; indeed, Weaver was completely unaware of Pladsen until he reached out to Weaver and requested a meeting. Nor did the police have any involvement in or control over Pladsen's activities. They were uninvolved in the placement of Pladsen in the cell next to the defendant, and Weaver's single meeting with Pladsen occurred several months before Pladsen obtained the incriminating information from the defendant. During the intervening months, Weaver never communicated directly with Pladsen and did not direct or control his interactions with the defendant. Most important, no state official ever asked, directed or suggested that Pladsen obtain any information from the defendant. In light of this evidence, I simply do not see how the trial court's finding that Pladsen was acting on his own initiative, rather than as an agent of the state, is not supported by substantial evidence.

The majority does not dispute most of these points. Instead, it approaches the agency question from an entirely different road—one that, in my view, cannot be reconciled with this court's prior cases. In so doing, the majority implicitly overrules or abrogates numerous of this court's prior decisions addressing agency questions in the context of sixth amendment and other constitutional claims. For instance, this court has long recognized that a trial court's agency determination is a factual question that must be upheld on appeal as long as it is supported by substantial evidence. Today, however, the majority reverses that line of cases and concludes that it is a mixed question of law of fact subject to plenary review.

Furthermore, and far more significant, the majority abandons this court's long settled test for determining whether an informant acted as a state agent—a test requiring some showing that the police had expressly or impliedly asked for information or offered an inducement for obtaining it—in favor of a new standard under which the dispositive question is whether the police "knew or should have known" that the conversation with the informant "was likely to end in further deliberate elicitation." I respectfully disagree with this new standard. In my view, it is based on a misreading of the United States Supreme Court's decision in *United States* v. *Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), a case widely regarded as largely irrelevant to the agency prong of *Massiah*, and is at odds with precedent from this court and other jurisdictions.

Finally, even accepting the majority's framing of the correct standard, I disagree that Weaver "knew or should have known" that his meeting with Pladsen, as opposed to Pladsen's own preexisting desire to curry favor with the police, would have prompted Pladsen to attempt to elicit additional incriminating information from the defendant. In my view, the majority's analysis reads more into the testimony at the suppression hear-

ing than is appropriate, relies on factors that have limited or no relevance to agency, and is based primarily on the majority's own assumptions about what motivated Pladsen and how he interpreted his meeting with Weaver, some of which are undermined by Pladsen's own testimony.

To be sure, the majority raises some legitimate concerns about the way in which Weaver handled his interactions with Pladsen. In particular, Weaver asked Pladsen if he would be willing to wear a wire sometime in the future in order to record his conversations with the defendant. Although Weaver never pursued the wire and made clear to Pladsen that he was not authorizing such a tactic and, in fact, lacked authority to proceed any further, such a statement, when considered in isolation, could arguably have suggested to Pladsen that additional incriminating information was desired. Ultimately, however, the significance the majority accords this statement is directly contradicted by Pladsen's own testimony—which was credited by the trial court—that he had not been offered anything or directed to do anything, and that he obtained the information from the defendant, not as a result of anything Weaver had said to him, but on his own initiative.

## I

## APPLICABLE LEGAL PRINCIPLES

I begin with the general principles governing the defendant's claim. Under *Massiah* v. *United States*, supra, 377 U.S. 201, a defendant's sixth amendment right to counsel is violated if a state agent deliberately elicits incriminating information from the defendant after formal charges have been brought and outside the presence of the defendant's counsel. Id., 205–206. "[T]he prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine* v. *Moulton*, 474 U.S. 159, 171, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).

To prevail on a *Massiah* claim, the defendant must demonstrate that the informant both (1) was acting as an agent of the state, and (2) "deliberately elicited" the incriminating statements from him. (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 855–56. Under this dual pronged analysis, "the agency inquiry *is precedent to and distinct from* determining whether [the] agent 'deliberately elicits' information." (Emphasis added.) *Creel* v. *Johnson*, 162 F.3d 385, 393 (5th Cir. 1998), cert. denied, 526 U.S. 1148, 119 S. Ct. 2027, 143 L. Ed. 2d 1038 (1999); see, e.g., *State* v. *Swinton*, supra, 855–56 (analyzing separately questions of agency and deliberate elicitation).

In the present case, the state does not contest that Pladsen deliberately elicited information from the defendant. The sole issue is whether Pladsen was acting

as an agent of the state when he did so. As I will explain; see part II of this opinion; there is ample support in the record for the trial court's finding that he was not.

## A

### Standard of Review

Before addressing the substantive agency question, however, I must note my disagreement with the majority's treatment of the trial court's finding that Pladsen was not acting as an agent of the state as a question of law that is subject to plenary review. I would adhere to this court's long line of decisions, all of which recognize that such determinations are factual findings that are entitled to deference on appeal.

It is well settled in Connecticut that "[t]he issue of agency, even in a constitutional context, is primarily a question of fact . . . ." (Citations omitted.) *State* v. *Alexander*, 197 Conn. 180, 185, 496 A.2d 486 (1985); see also *State* v. *Swinton*, supra, 268 Conn. 855 (agency is "issue of fact"). Ordinarily, this court cannot overturn factual findings unless they are clearly erroneous. "When, however, [a question of fact is essential to the resolution of a constitutional claim and] the credibility of the witnesses is not the primary issue, our customary deference to the trial court is tempered by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Alexander*, supra, 185.

This "substantial evidence" standard of review, however, although less deferential than the clearly erroneous standard, does not amount to plenary review. See *State* v. *Pinder*, 250 Conn. 385, 421, 736 A.2d 857 (1999) ("the 'substantial evidence' language" is "inconsistent with the plenary review that we in fact conduct" when reviewing legal question of whether confession is voluntary); see also *State* v. *Johnson*, 253 Conn. 1, 124–26, 751 A.2d 298 (2000) (*Schaller, J.*, dissenting) (scrupulously reviewing record for substantial evidence is more deferential than plenary review). In other words, we cannot disregard the trial court's finding and make our own independent determination as to whether Pladsen was an agent of the state. Rather, the trial court's conclusion is "entitled to deference so long as [it is] supported by substantial evidence . . . ." *State* v. *Whitaker*, 215 Conn. 739, 754, 578 A.2d 1031 (1990). That is why this court has upheld findings that no agency relationship existed on appeal, even when the record revealed some evidence tending to show such a relationship. See *State* v. *Alexander*, supra, 197 Conn. 187 (trial court's finding that private citizen was not state agent was supported by substantial evidence despite extensive police involvement and encouragement because "[b]alanced against these factors" was evidence that "support[ed] the trial court's conclusion"); see also *State* v. *Lasaga*,

269 Conn. 454, 466–67, 848 A.2d 1149 (2004) (upholding finding of no agency relationship despite "conflicting testimony regarding whether the police had asked [the private citizen] to continue to provide them with more information").

The majority acknowledges this "substantial evidence" limitation on our scope of review in passing but then proceeds to treat agency as a mixed question of law and fact, deferring only to the trial court's subsidiary factual findings, while reviewing de novo the court's ultimate determination of whether those facts created an agency relationship.[3]

This court, however, has uniformly recognized that the ultimate determination of agency is *itself* a factual finding; see *State* v. *Swinton*, supra, 268 Conn. 855; *State* v. *Alexander*, supra, 197 Conn. 185; that must be upheld on appeal as long as there is substantial evidence to support it. See *State* v. *Betts*, 286 Conn. 88, 101, 942 A.2d 364 (2008) ("there was substantial evidence to support the trial court's conclusion that [the private actor] was not an agent of the police"); *State* v. *Lasaga*, supra, 269 Conn. 466 ("our examination of the record reveals that there was substantial evidence for the trial court's conclusion" that private actor was not state agent); *State* v. *Alexander*, supra, 185 ("there was substantial evidence for the trial court's conclusion that [the private actor] was not acting as an agent of the state"); see also *State* v. *Betts*, supra, 95 n.14 (emphasizing that agency issues are correctly reviewed under substantial evidence rather than plenary standard).

In footnote 19 of its opinion, the majority expressly disavows the substantial evidence method of review applied in these prior decisions—thereby rendering the conclusions reached in those decisions of virtually no precedential value—in favor of the de novo standard employed by many of the federal courts of appeals.[4] Although I welcome any tacit concession from the majority that the trial court's determination that Pladsen was not a state agent is supported by substantial evidence and would have to be upheld under that standard, I see no compelling reason to take the drastic step of overturning this body of case law, particularly when neither party in the present case has explicitly asked us to do so, and when federal courts of appeals are split on the issue.[5] See *State* v. *McCleese*, 333 Conn. 378, 412–13, 215 A.3d 1154 (2019) ("when no party has asked us to overrule precedent, we are particularly reluctant to address . . . much less disturb" such precedent).

The majority's use of a plenary standard of review colors its analysis in substantive ways. Rather than limit itself to the question of whether there is adequate support in the record for the trial court's finding, the majority bases its analysis largely on its own assumptions about Pladsen's subjective motivations and how he

likely interpreted his conversation with Weaver. For instance, the majority posits that Weaver's meeting with Pladsen must have "indicate[d]" to Pladsen that the state wanted incriminating information about the defendant; that Pladsen must have "readily infer[red]" that the state only wanted verifiable evidence about this particular case, "such as a recording or writing"; that their conversation suggested to Pladsen that the state would be willing to provide him with a benefit in exchange for information; and that the state's decision not to object to Pladsen's subsequent request for modification of his sentence "provided something objectively valuable [to Pladsen] in exchange for [his] cooperation."

Pladsen, however, who was questioned extensively at the suppression hearing, never testified that he interpreted his meeting with Weaver in the manner that the majority suggests. Nor did the trial court make any such factual findings. I, of course, acknowledge that our scrupulous review of the record "must take account of any undisputed evidence that does not support the trial court's ruling . . . but that the trial court did not expressly discredit." *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.2d 861 (2016); see also *State* v. *DeMarco*, 311 Conn. 510, 520 and n.4, 88 A.3d 491 (2014). This basic proposition does not, however, permit this court to draw its own factual inferences from the evidence and then use those inferred facts as the basis for reversing the trial court's ultimate finding that Pladsen was not a state agent. The limited question before us is whether the trial court's finding is supported by substantial evidence, not whether we, ourselves, would draw a different conclusion on the basis of that evidence.

Indeed, a number of the majority's assumptions about how Pladsen interpreted his meeting with Weaver are directly contradicted by Pladsen's own testimony, which the trial court expressly credited.[6] For instance, contrary to the majority's supposition that the meeting confirmed in Pladsen's mind that the state would treat him favorably in exchange for information about the defendant, Pladsen testified that Weaver made it "very clear" that he could offer no deals or benefits, and flatly denied that he and Weaver had reached any mutual understanding by "implication," that anything had been "implied" to him, or that there was any "meeting of the minds . . . ." Further, any suggestion by the majority that Pladsen's decision to elicit information from the defendant was spurred on by Weaver is hard to square with Pladsen's testimony that, when he left the meeting, he did not necessarily intend to seek information from the defendant, and that his subsequent decision to do so (made several months later) was one that he made "on [his] own."

Accordingly, I would adhere to this court's prior decisions and review the trial court's determination of

agency only for substantial evidence. The majority's resort to plenary review, in addition to its overruling of these prior cases, results in an analysis that is untethered to the trial court's factual findings and is based entirely on its own independent interpretation of the evidence. Such an approach invades the province of the trial court as principal fact finder. See, e.g., *State* v. *Johnson*, supra, 253 Conn. 124 (*Schaller, J.*, dissenting) (application of de novo rather than substantial evidence review to factual determination "invad[es] the province of the jury").

## B

### Legal Standard for Determining Agency

I also disagree with the legal standard the majority applies for determining whether Pladsen was a state agent. Abandoning the multifactor test recognized in this court's prior agency cases, the majority relies on *United States* v. *Henry*, supra, 447 U.S. 264, to conclude that Pladsen was a state agent because Weaver "knew or should have known" that the conversation with the informant "was likely to end in further deliberate elicitation." I disagree with the majority's adoption of this new standard. As case law from this court and other jurisdictions has recognized, agency depends not on what the officer knew or should have known, but on whether the officer's conduct amounted to an express or implied request for information or offer of a benefit in exchange for information.

As an initial matter, *Henry* is of limited import in the present case because it was decided in the context of the deliberate elicitation prong of *Massiah*, rather than the agency prong. Indeed, the agency relationship between the inmate and the government was clear and virtually undisputed in *Henry*. The inmate had been serving the government as a paid informant for more than one year pursuant to a contingency fee arrangement under which the government would compensate him only when he provided favorable information.[7] *United States* v. *Henry*, supra, 447 U.S. 270. Government officers directed the inmate to approach the defendant, who was housed in the same jail awaiting trial, and instructed him "not to initiate" any conversations with the defendant but to "be alert to any statements" that the defendant might make about the crimes for which he was charged. Id., 266. Despite these instructions, the inmate engaged the defendant in conversations and extracted incriminating statements from him, which later were admitted against him at trial. Id., 266–67. The government paid the inmate for this assistance. Id., 266.

The United States Supreme Court framed the issue as being "whether under the facts of this case a [g]overnment agent 'deliberately elicited' incriminating statements from [the defendant] within the meaning of *Mas-*

*siah.*" Id., 270. In answering this question in the affirmative, the court relied on three factors: "First, [the informant] was acting under instructions as a paid informant for the [g]overnment; second, [the informant] was ostensibly no more than a fellow inmate of [the defendant]; and third, [the defendant] was in custody and under indictment at the time he was engaged in conversation by [the informant]." Id. In response to the government's argument that the informant had been specifically instructed not to affirmatively seek information, the court made the following observation, which the majority seizes on in the present case: "Even if the [officer's] statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, *he must have known* that such propinquity likely would lead to that result." (Emphasis added.) Id., 271.

I do not believe that *Henry* stands for the proposition that agency depends on whether the officer who meets with the informant "must have known" that their conversation would cause the informant to later attempt to seek additional information from the defendant. See *State* v. *Willis*, 496 S.W.3d 653, 709 (Tenn. 2016) (Rejecting argument that "the defendant may establish that an informant was a government agent by a mere showing that the [s]tate 'must have known that its agent was likely to obtain incriminating statements' from the defendant without counsel present . . . . We must reject any test that would deem an informant to be a government agent simply because the government was aware or 'must have known' that the informant would likely receive incriminating statements from the defendant."), cert. denied,      U.S.     , 137 S. Ct. 1224, 197 L. Ed. 2d 466 (2017).

Indeed, as courts have consistently recognized, *Henry* says little about agency at all. The United States Supreme Court "essentially assumed the existence of agency" in *Henry* because the informant's contingency fee arrangement with the government made agency a nonissue. *Thomas* v. *Cox*, 708 F.2d 132, 135 n.2 (4th Cir.), cert. denied, 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 262 (1983). Instead, the focus in *Henry* was on the distinct question of whether the statements were "deliberately elicited . . . ." *United States* v. *Henry*, supra, 447 U.S. 277 (Powell, J., concurring) ("I understand that the decision today rests on a conclusion that this informant deliberately elicited incriminating information"); see also *Creel* v. *Johnson*, supra, 162 F.3d 393 (declining to adopt principle from *Henry* as standard for determining agency because *Henry* concerned only deliberate elicitation prong); *United States* v. *York*, 933 F.2d 1343, 1356 (7th Cir.) ("*Henry* . . . focused more directly on whether the challenged statements had been deliberately elicited rather than the question of whether the informants were acting as government agents") (overruled in part on other grounds

by *Wilson* v. *Williams*, 182 F.3d 562, 565 (7th Cir. 1999)), cert. denied, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991); *United States* v. *Watson*, 894 F.2d 1345, 1347–48 (D.C. Cir. 1990) (fact that informant was in custody, which was relied on as relevant factor in *Henry*, is irrelevant to agency); *State* v. *Swinton*, supra, 268 Conn. 858 (noting that *Henry* did not discuss agency); *State* v. *Alexander*, supra, 197 Conn. 184 ("*Henry* did not specifically address the question of agency"). Thus, the majority's reliance on *Henry* for the governing standard on agency questions in misplaced.

Moreover, this court has never interpreted *Henry* as suggesting that an agency relationship depends on what the officer who met with the informant knew or should have known. Instead, this court explained in *Alexander*: "In *Henry*, the [c]ourt considered it critical that the informant, previously in the government's paid employ in similar missions, was specifically contacted by the government and given his charge respecting the procurement of possibly incriminating information from [the defendant]. Also important to the *Henry* [c]ourt was the fact that the informant's mission was on a [contingent fee] basis . . . thereby demonstrating a formal prearrangement . . . between [the] state and [the] informant . . . . From these circumstances the [c]ourt in *Henry* was able to characterize the informant as a [g]overnment agent expressly commissioned to secure evidence . . . from the accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, supra, 197 Conn. 184, quoting *Thomas* v. *Cox*, supra, 708 F.2d 135; see also *State* v. *Swinton*, supra, 268 Conn. 858 (characterizing *Henry* as case in which "government officials . . . identified [a] specific [prisoner] from whom they wanted information and found [an informant] to retrieve that information").[8] Thus, it was the officers' specific instructions to the informant and their preexisting fee arrangement with him—and not the officers' constructive knowledge— that drove the United States Supreme Court's agency analysis in *Henry*.

Consistent with this interpretation of *Henry*, this court, in *Alexander*, established the following standard for addressing agency questions: "The existence of an agency relationship . . . turns [on] a number of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated . . . whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it . . . and whether the information is secured as part of a government initiated, [preexisting plan]." (Citations omitted.) *State* v. *Alexander*, supra, 197 Conn. 184–85. Since *Alexander*, this court has consistently relied on these factors as "the primary factors to be considered in determining when an other-

wise private citizen has become an agent of the government." *State* v. *Gordon*, 197 Conn. 413, 421, 504 A.2d 1020 (1985); see id. (relying on factors in context of sixth amendment right to counsel); see also *State* v. *Betts*, supra, 286 Conn. 89, 96 (fourth amendment search and seizure); *State* v. *Lasaga*, supra, 269 Conn. 463–64 (fourth amendment search and seizure); *State* v. *Swinton*, supra, 268 Conn. 855–59 (sixth amendment right to counsel).

As the *Alexander* factors indicate on their face, an agency analysis turns not on the officer's constructive knowledge about the informant's likely future conduct, but on whether the officer said or did anything that amounted to an express or implied request for information or offer of a reward for information. A review of this court's sixth amendment cases demonstrates that, in the absence of these minimal requirements, there is no agency relationship.

*Alexander*, this court's leading agency decision in the sixth amendment context, is perhaps the most compelling example. In that case, the defendant was incarcerated while awaiting trial on arson charges. *State* v. *Alexander*, supra, 197 Conn. 181, 188. At the time, the victim, who had been implicated as an accomplice in that arson, was missing. Id., 181. James Papagolas, who had befriended both the defendant and the victim, encountered two police officers by chance and informed them that he was planning to visit the defendant in jail. Id., 182, 186. Papagolas "agreed to contact the police if he heard anything about the victim." Id., 186. During a subsequent visit, the defendant admitted to Papagolas that he had killed the victim. Id. Papagolas immediately informed the officers of the defendant's confession. Id.

After learning of the defendant's admission, the officers drove Papagolas to the jail on three subsequent occasions for additional visits with the defendant. Id. Each time, the officers waited for Papagolas outside the jail, and, on the ride home, Papagolas told them what he had learned from the defendant. Id. During the final visit, the defendant told Papagolas where the victim's body was located. Id., 186–87. At his trial for the murder, the defendant moved to suppress the incriminating statements he made to Papagolas on the ground that they were elicited from him without his counsel present, in violation of *Massiah*. Id., 182–83. The trial court found that Papagolas was not acting as a state agent and admitted the statements. Id., 183.

This court affirmed, concluding that there was "substantial evidence" to support the trial court's finding because, "[a]lthough the police may have supported and even encouraged Papagolas' efforts to obtain information from the defendant, their involvement was not so extensive as to create an agency relationship." Id., 185–86. This court acknowledged that "[t]he transportation service provided by the police is the strongest

evidence of a possible agency relationship" and that there was evidence that, "by the time of his final visit, Papagolas was motivated, at least in part, by a feeling of responsibility toward the police." Id., 187. "There was also conflicting testimony about whether [the officers] ever asked Papagolas to go to the jail to get information as opposed to simply supporting his own decision to go there." Id. Nonetheless, this court concluded that, "[i]n sum," the record provided adequate support for the trial court's finding because "[b]alanced against these factors, which tend to show police involvement, is the fact that the police neither initiated contact with Papagolas nor directed his activities. Papagolas had no previous affiliation with the police and was neither rewarded monetarily nor promised any favors in return for his cooperation." Id.

Given the officers' extensive involvement with Papagolas—they drove him to visit the defendant multiple times after learning he had elicited a confession from the defendant—they surely "knew or should have known" that their conduct would lead to Papagolas' attempt to elicit additional incriminating statements from the defendant. See *State* v. *Betts*, supra, 286 Conn. 98 ("[*Alexander*] illustrates how extensive police contact with a private citizen may be without creating an agency relationship"). Nonetheless, this court upheld the trial court's finding that Papagolas was not an agent of the state, demonstrating that agency does not depend on what the officers must have known but, rather, on whether they "directed [the informant's] activities" or promised something "in return for [the informant's] cooperation."[9] *State* v. *Alexander*, supra, 197 Conn. 187. Indeed, as I will explain; see part II of this opinion; *Alexander* cannot be reconciled with the majority's conclusion in the present case.[10]

This court also emphasized these baseline agency requirements in the jailhouse informant context in *State* v. *Swinton*, supra, 268 Conn. 781. In *Swinton*, an inmate assisted the police in multiple cases unrelated to the defendant. Id., 852–53. While still serving as an informant in one of those unrelated cases, the inmate had numerous conversations with the defendant, during which the defendant made incriminating statements. Id., 853. This court held that the inmate was not an agent of the state when he obtained these statements because the police had given him "no instructions whatsoever . . . that he was to gather information about crimes . . . or that he would be rewarded if he provided any such information." (Internal quotation marks omitted.) Id., 858. This court emphasized that, in the absence of any such directive or promise, "a trial court [correctly] may determine that an informant was not so much a government agent . . . as he was an entrepreneur who hoped to sell information to the government." (Internal quotation marks omitted.) Id.; see also *State* v. *Lasaga*, supra, 269 Conn. 466 (private citizen

was not state agent when police promised him no favors in return for cooperation); *State* v. *Gordon*, supra, 197 Conn. 422–23 (private citizen was not state agent when there was no evidence to support claim of "implied exchange of promises [to] obtain information for the state" in exchange for benefit).

Consistent with *Alexander* and *Swinton*, courts in other jurisdictions similarly recognize that some type of state directive or promise is an essential prerequisite to an agency relationship under *Massiah*. "Although there are some differences in the approaches of the various jurisdictions, they are unified by at least one common principle: to qualify as a government agent, the informant must at least have some sort of agreement with, or act under instructions from, a government official." *Manns* v. *State*, 122 S.W.3d 171, 183–84 (Tex. Crim. App. 2003); see, e.g., *United States* v. *Ocean*, 904 F.3d 25, 33 (1st Cir. 2018) ("[a] successful *Massiah* objection requires a defendant to show, at a bare minimum, that the person with whom he conversed had previously been enlisted for that purpose by the authorities" (internal quotation marks omitted)), cert. denied sub nom. *Mitchell* v. *United States*, U.S. , 139 S. Ct. 931, 202 L. Ed. 2d 656 (2019), and cert. denied, U.S. , 139 S. Ct. 1362, 203 L. Ed. 2d 596 (2019); *Creel* v. *Johnson*, supra, 162 F.3d 394 ("[i]n the absence of a quid pro quo between [the informant] and [the police], and in the absence of instruction or control by the [s]tate, we hold that [the informant] was not a government agent"); *United States* v. *Birbal*, 113 F.3d 342, 346 (2d Cir.) ("[o]ther circuits agree that an informant becomes a government agent . . . only when the informant has been instructed by the police to get information about the particular defendant"), cert. denied, 522 U.S. 976, 118 S. Ct. 433, 139 L. Ed. 2d 333 (1997); *United States* v. *Brink*, 39 F.3d 419, 423 (3d Cir. 1994) ("[a]n inmate who voluntarily furnishes information without instruction from the government is not a government agent"); *Depree* v. *Thomas*, 946 F.2d 784, 794 (11th Cir. 1991) ("[a]t a minimum . . . there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation takes place"); *Commonwealth* v. *Foxworth*, 473 Mass. 149, 158, 40 N.E.3d 1003 (2015) ("[a]n individual's actions will not be attributed to the [s]tate if no promises are made for that individual's help and if nothing was offered to or asked of that individual" (emphasis omitted; internal quotation marks omitted)).[11]

In adopting this new "must have known" standard from *Henry*, under which there need not be any showing that the officer expressly or tacitly asked for information or offered a benefit in exchange for it, the majority impliedly overrules all of this court's aforementioned agency decisions, which had explicitly recognized these elements as the minimum requirements needed to

establish an agency relationship under *Massiah*. In my view, this prior approach, which is fully consistent with decisions from other jurisdictions, "gives better guidance to law enforcement authorities" about "what they can or cannot do"; *United States* v. *LaBare*, 191 F.3d 60, 65 (1st Cir. 1999); than the amorphous "must have known" test that the majority announces today.

I would therefore adhere to the agency standard employed in this court's prior decisions. With that standard in mind, I turn to an analysis of the evidence in the present case.

## II

### ANALYSIS

In my view, and in light of the authorities discussed in part I of this opinion, there is substantial evidence in the record to support the trial court's finding that Pladsen was not acting as a state agent when he elicited the incriminating information from the defendant. Indeed, Pladsen's testimony at the suppression hearing, which this court is bound to accept on appeal because the trial court credited it; see, e.g., *State* v. *DeMarco*, supra, 311 Conn. 519–20; is itself sufficient to support the trial court's finding because it directly undermines the essential requirements of agency. Pladsen testified that he and Weaver entered into no "agreement of any sort," including by "implication."[12] Pladsen further testified that Weaver did not offer him any benefits but had in fact made "very clear" that he "wasn't allowed to make any deals" or "do anything" without authorization from the Office of the State's Attorney.[13] See, e.g., *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993) (there was no agency relationship when government indicated it was offering no benefit in exchange for information), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 158 (jailhouse informant was not state agent when police told him they lacked authority to enter into any agreements with him and that no promises were being made).

Furthermore, Pladsen testified that Weaver did not direct him to take any action relative to the defendant and that he decided to elicit the incriminating information *on his own accord*:

"[The Prosecutor]: With respect to any of those actions . . . up to the point when [the defendant] gave you the [note] or even [when] subsequently talking to [the defendant] again this week, did Detective Weaver ever direct you to do anything relative to [the defendant]?

"[Pladsen]: No.

"[The Prosecutor]: *You did this on your own?*

"[Pladsen]: *Yes.*

\* \* \*

"[Defense Counsel]: Did you talk to Detective Weaver about different ways to obtain information from [the defendant]?

"[Pladsen]: No. No, not at all.

"[Defense Counsel]: Did Detective Weaver ever speak to you about getting information from [the defendant] by asking him questions about his cases?

"[Pladsen]: No. He never told me to ask [the defendant] questions about his cases." (Emphasis added.)

In fact, Pladsen testified that, when he asked Weaver if he should obtain information from the defendant, Weaver told him to "just wait" until he could speak to the Office of the State's Attorney to determine how, or if, to proceed. Despite this admonishment, and despite not having communicated directly any further with Weaver for several months, Pladsen took it upon himself to convince the defendant to write a note containing details about the crime under the guise that Pladsen would use it to discredit Weaver as a trial witness. Regarding his decision to seek the note, Pladsen testified:

"[Defense Counsel]: And was it your testimony that it was your idea to try to get [the defendant] to write something down?

"[Pladsen]: Yes. It was. It was kind of a spur of the moment type of thing. It wasn't like I planned on like doing it, but the opportunity presented itself, so I took advantage of it if you want to say."

Pladsen's testimony conclusively demonstrates that he did not elicit the information in response to any express or implied agreement with or directive from Weaver. Rather, Pladsen obtained the information on his own initiative, or, as Pladsen put it, "on [his] own," as a "spur of the moment" decision he made when "the opportunity presented itself . . . ." This testimony alone permitted the trial court to find that Pladsen "was not so much a government agent . . . as he was an entrepreneur who hoped to sell information to the government." (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 858; see also *United States* v. *Birbal*, supra, 113 F.3d 346 ("[t]he [s]ixth [a]mendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant"); *United States* v. *York*, supra, 933 F.2d 1356 (*Massiah* is not violated when "an individual, acting on his own initiative, deliberately elicits incriminating information" (internal quotation marks omitted)).

Moreover, the state's minimal contact with Pladsen and lack of control over his activities provides even further support for the trial court's finding that he was not acting as an agent of the state. See *Thomas* v. *Cox*, supra, 708 F.2d 137 (single meeting between inmate and officer, at which officer instructed inmate to listen but not to ask questions, did not demonstrate "requisite degree of . . . ongoing cooperation between [the] state and [the] witness required to implicate the state"[14] (internal quotation marks omitted)). Indeed, the police involvement in the present case was far less extensive than the officer provided "transportation service" that this court held was insufficient to establish agency in *State* v. *Alexander*, supra, 197 Conn. 186–87. See part I B of this opinion.

Pladsen and Weaver had a single meeting on January 5, 2007. The police did not seek out Pladsen. It was Pladsen who initiated the meeting by representing in his December 27, 2006 letter to Weaver that he had incriminating information he wanted to provide. Pladsen had no history of serving as an informant, and Weaver was completely unaware of Pladsen until receiving his letter. The police also did not put Pladsen in a position to obtain information from the defendant. They were uninvolved in placing Pladsen in the cell next to the defendant, and no one instructed Pladsen to cultivate a relationship with him. Moreover, following their meeting, Weaver had no control over whether, or how, Pladsen interacted with the defendant. See, e.g., *United States* v. *Li*, 55 F.3d 325, 328 (7th Cir. 1995) (cooperating witness was not government agent when "[t]he evidence demonstrated no government control over [the witness'] actions; most importantly, there was no control over [the witness'] decision to arrange a meeting with [the defendant]"); *United States* v. *Surridge*, 687 F.2d 250, 255 (8th Cir.) (there was no *Massiah* violation when "[the] police do nothing to direct or control or involve themselves in the questioning"), cert. denied, 459 U.S. 1044, 103 S. Ct. 465, 74 L. Ed. 2d 614 (1982).

I recognize that, as the majority points out, there were certain aspects of Weaver's meeting with Pladsen that could serve as evidence of the existence of an implied agency relationship. See, e.g., *Ayers* v. *Hudson*, 623 F.3d 301, 311–12 (6th Cir. 2010) (agency may be established through implicit conduct because, otherwise, "the [s]tate [could] accomplish with a wink and a nod what it cannot do overtly" (internal quotation marks omitted)); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 158 ("[a]n agency relationship may arise other than by express agreement, and may evolve . . . by implication from the conduct of the parties" (internal quotation marks omitted)). Specifically, Weaver told Pladsen that the police were "always interested" in and would "listen" to verifiable information, asked Pladsen

if he would be willing to wear a wire at some point in the future, and left Pladsen with his contact information.

In light of the entire record, however, these facts do not justify overturning the trial court's finding that Pladsen was not a state agent. First, none of these statements or actions amounts to an express or implied request for information or offer of a benefit.[15] Second, and most important, Pladsen's testimony demonstrates that he did not interpret Weaver's actions as tacitly suggesting that he should obtain information from the defendant or that he would receive a benefit for doing so.[16] Pladsen testified that he and Weaver had no mutual understanding or "meeting of the minds," and that "there was nothing implied . . . there was no implication, and there was no contractual agreement of any sort." Pladsen further testified that Weaver never told him to ask the defendant questions about Weaver's cases or to "do anything relative to" the defendant, that he obtained the information from the defendant "on [his] own," and that Weaver had made it "very clear" that he "couldn't do anything" or offer any benefits.[17]

Whether this court believes Pladsen's testimony that Weaver had not implied to him that he would receive a benefit in exchange for information is beside the point. The trial court credited Pladsen's testimony, and this court must defer to that credibility assessment on appeal.[18] I see nothing in the record to suggest that Pladsen's testimony that he and Weaver entered into no express or implied quid pro quo was false or mistaken. Indeed, Weaver's account of the meeting was fully consistent with Pladsen's account in this regard.[19]

On the basis of this evidence—Pladsen's testimony that he was acting on his own initiative rather than in response to an express or implied agreement with or directive from the state, and the absence of any significant police involvement or control—there is substantial evidence in the record to support the trial court's finding that Pladsen was not acting as an agent of the state when he elicited the incriminating information from the defendant.[20]

### III

### THE MAJORITY'S ANALYSIS

Even accepting the majority's premise that agency depends on whether Weaver "knew or should have known" that his meeting with Pladsen was likely to cause Pladsen to attempt to elicit additional information from the defendant, I disagree that such a standard has been satisfied in the present case. As previously explained, Weaver gave Pladsen no directives and offered him no rewards, and even ignored his calls in the months following their meeting. Nor is there any evidence that Pladsen ever informed Weaver that he intended to obtain information from the defendant. This is a far cry from *Henry*, in which the government had

a long-standing agreement with the informant to pay him only when he obtained favorable information and specifically directed the informant to approach the defendant and to attempt to obtain incriminating statements.[21] See *United States* v. *Henry*, supra, 447 U.S. 266, 270.

In concluding otherwise, the majority contends, first, that Pladsen's meeting with Weaver "appears to have focused Pladsen's efforts" on this particular case, as opposed to the defendant's other then pending criminal matters. I disagree that this is a fair inference on this record. Neither Weaver nor Pladsen testified to this effect. Although they discussed the defendant's case during their meeting, there is no evidence that Weaver was the one to bring it up or that the information Pladsen had hoped to convey to Weaver during this meeting concerned only unrelated cases.

To the contrary, the record suggests that the opposite inference is far more reasonable. Pladsen's letter to Weaver dated December 27, 2006, stated that Pladsen had "some information that could be very useful to [him] and one of [his] cases." The investigation of the victim's murder was one of Weaver's cases, and Weaver testified at the suppression hearing that, during their meeting, Pladsen provided him with information that Pladsen *had already obtained* about the victim's murder. This strongly suggests that the "information" Pladsen offered to provide to Weaver in the letter concerned this case.[22] Moreover, Weaver testified that Pladsen had asked whether he would receive a benefit if he provided information "about the [victim's] investigation," suggesting that *Pladsen* was the one to broach the topic.

On this same point, the majority goes on to conclude that Pladsen's discussion with Weaver must have suggested to Pladsen that "the state was principally interested in objectively verifiable forms of evidence regarding the defendant's involvement in this particular case, such as a recording or writing," and that, "[a]lthough Weaver made no explicit requests during this meeting, the handwritten note that Pladsen ultimately produced during the state's case-in-chief mirrored those requirements precisely." The majority appears to suggest that the similarities between what Pladsen and Weaver discussed, and what Pladsen ultimately obtained, indicate that Weaver had specifically requested that information. I disagree.

The note hardly "mirror[s]" what Pladsen and Weaver discussed in their meeting; it may be *consistent* with what was discussed, but only on the most general of levels, i.e., it concerned this case and was "verifiable" in that it was handwritten by the defendant, as opposed to being based on Pladsen's word alone. This does not evidence the existence of an agency relationship. If Weaver had mentioned a *specific* detail in the case, such as the type of weapon used in the murder, and

Pladsen returned with information about that specific detail, it might have suggested that Weaver had requested that information. See *Ayers* v. *Hudson*, supra, 623 F.3d 315–16 (inferring agency relationship when informant "knew exactly what questions to ask [the defendant] regarding the details of the murder" after meeting with police). Nothing of the sort occurred here; Pladsen and Weaver discussed the victim's case in only general terms. In any event, Pladsen's testimony at the suppression hearing forecloses any claim that Weaver suggested that he obtain any information, verifiable or otherwise, from the defendant. See part II of this opinion.

Second, the majority places substantial significance in the fact that Pladsen "sought assurance from Weaver that a benefit would be made available in exchange for his cooperation." The fact that Pladsen hoped or even expected to receive a benefit, however, did not render him an agent. "We must not confuse speculation about [an informant's] motives for assisting the police for evidence that the police promised [the informant] consideration for his help or, otherwise, bargained for his active assistance. [The informant's] motives alone cannot make him an agent of the police even if the police knew and understood that his motives probably were self-serving and related to getting police cooperation in his own case." *Lightbourne* v. *Dugger*, 829 F.2d 1012, 1021 (11th Cir. 1987), cert. denied, 488 U.S. 934, 109 S. Ct. 329, 102 L. Ed. 2d 346 (1988). Indeed, "most inmates who provide information to law enforcement officials harbor the hope that their service will not go unrewarded. . . . That inmates realize there is a market for information about crime does not make each inmate who enters the market a government agent." (Citation omitted.) *United States* v. *York*, supra, 933 F.2d 1357; see also *State* v. *Swinton*, supra, 268 Conn. 858–59.

Relatedly, the majority appears to suggest that Weaver encouraged Pladsen's hope of receiving a benefit. As the basis for this assertion, the majority contends that, although Weaver told Pladsen that he could not offer any deals or benefits, Weaver "(1) informed Pladsen that the Office of the State's Attorney would have to approve any 'deals,' and (2) made Pladsen 'generally aware' of the fact that 'any information received' would be conveyed to the Office of the State's Attorney." I disagree.

Even if Weaver had said these things to Pladsen, which is not clearly borne out by the record,[23] it would not change the analysis. Courts have addressed similar statements and held that, without more, they do not establish agency. See, e.g., *United States* v. *Taylor*, 800 F.2d 1012, 1015 (10th Cir. 1986) (statements to jailhouse informant that information about cooperation would be "passed on" to appropriate authorities were insufficient to demonstrate agency in absence of agreement

or offer of benefit (internal quotation marks omitted)), cert. denied, 484 U.S. 838, 108 S. Ct. 123, 98 L. Ed. 2d 81 (1987); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 157–58 (there was no implied agency, despite police statements to jailhouse informant that information provided would be forwarded to officials with deal-making capacity, when police made no express or implied promises).

If anything, the record reflects that Pladsen was merely acting in accordance with his own long-standing desire to curry favor with law enforcement when he elicited the statements from the defendant. In August, 2006, months before meeting with Weaver, Pladsen began cultivating a relationship with the defendant for the specific purpose of using that relationship to coax the defendant into divulging incriminating information that he could then provide to law enforcement in exchange for favorable treatment. Once Pladsen did so, he initiated the meeting with Weaver, hoping Weaver could help him secure a reduction in the twenty-five year sentence he was serving for assaulting a prison guard.

Far from encouraging that hope, Weaver made "clear" to Pladsen that he could not provide him with any deals or benefits. Pladsen testified that this admonishment had the effect of *discouraging* any hope or expectation that he would receive anything in exchange for his cooperation. See footnote 17 of this opinion and accompanying text. Moreover, Pladsen testified—and the trial court credited—that he obtained the information from the defendant on his own accord. Accordingly, it is pure speculation to conclude, on this record, that "the animating force for securing [the] information [was] . . . attributable to the [state]"; *Schmitt* v. *True*, 387 F. Supp. 2d 622, 640 (E.D. Va. 2005), aff'd sub nom. *Schmitt* v. *Kelly*, 189 Fed. Appx. 257 (4th Cir.), cert. denied, 549 U.S. 1028, 127 S. Ct. 577, 166 L. Ed. 2d 425 (2006); rather than to Pladsen's own preexisting, subjective hope that he might obtain a benefit. Pladsen conducted himself exactly the same way before his meeting with Weaver as he did after it.

Third, the majority contends that the fact that the state did not object to Pladsen's subsequent attempt to obtain a reduction in his sentence is relevant because it amounts to the provision of a benefit. Under the specific circumstances of the present case, I disagree. To have any bearing on the agency analysis, the benefit must have "already been promised at the time the informant elicited the information; if not, later receipt of a benefit is of no consequence." *Manns* v. *State*, supra, 122 S.W.3d 188; see also *Creel* v. *Johnson*, supra, 162 F.3d 393 (decision of police not to prosecute was irrelevant to agency because there was no evidence that "anyone promised . . . not to pursue [the] charges *in exchange for* [the informant's] assistance" (emphasis

added)); *Lightbourne* v. *Dugger*, supra, 829 F.2d 1020–21 (agreement to assist informant in obtaining bail did not create agency relationship because it was not made until after informant elicited incriminating statements); *Commonwealth* v. *Foxworth*, supra, 473 Mass. 158–59 (fact that informant received favorable treatment was irrelevant to agency "[in the absence of] evidence that such treatment had been promised in exchange for information yet to be obtained").

Although I agree with the majority that the subsequent receipt of a benefit can, under some circumstances, serve as circumstantial evidence that an agency relationship previously had existed, or that the benefit previously had been offered, the record in this case forecloses any such inference. Pladsen's testimony at the suppression hearing, which, again, this court must accept because the trial court credited it, was that Weaver offered him no benefits during their January 5, 2007 meeting. Weaver testified to the same effect. Weaver and Pladsen had no further direct communications until months later, *after* Pladsen had obtained the note.

Moreover, Pladsen testified at the defendant's trial that he was not expecting to receive a benefit because Weaver had disclaimed any authority to provide him with any benefit. See footnote 17 of this opinion. This evidence demonstrates that any benefit Pladsen ultimately received for his assistance had not been offered to him before he elicited the incriminating information from the defendant. In fact, this evidence strongly suggests that the state's *decision* to provide Pladsen with a benefit had not even been made until after he obtained the statements. Accordingly, Pladsen's later receipt of a benefit does not provide any evidence of agency.

Finally, the majority relies on the fact that the defendant was incarcerated when Pladsen elicited the incriminating statements from him. The majority cites the United States Supreme Court's observation in *United States* v. *Henry*, supra, 447 U.S. 274, that "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents." The fact of custody, however, although relevant to the deliberate elicitation prong of a *Massiah* claim, has no bearing on the threshold question of agency, which focuses not on the susceptibility of the defendant to ploys, but on the "extent of police involvement with the informant." *State* v. *Alexander*, supra, 197 Conn. 184.

Indeed, the United States Supreme Court clarified in a footnote that "the fact of custody bears on whether the [g]overnment 'deliberately elicited' the incriminating statements from [the defendant]." *United States* v. *Henry*, supra, 447 U.S. 274 n.11. Relying on this footnote, the United States Court of Appeals for the District

of Columbia held that "it is of no moment that the incriminating conversations took place while the accused was incarcerated" because the fact of custody is relevant only to the question of deliberate elicitation and "does not bear [on] the anterior question whether th[e] [informant] was acting on behalf of the [g]overnment [which] depends solely [on] whether he was acting [on] the instruction of a government official." *United States* v. *Watson*, supra, 894 F.2d 1347–48; see also *United States* v. *Johnson*, 196 F. Supp. 2d 795, 855, 860 (N.D. Iowa 2002) (fact that defendant was in custody demonstrated deliberate elicitation but was not relevant to agency), rev'd on other grounds, 338 F.3d 918 (8th Cir. 2003); *Wallace* v. *Price*, Docket No. 99-231, 2002 WL 31180963, *68 and n.54 (W.D. Pa. October 1, 2002) (fact of custody relates to "the mental state of the defendant, his vulnerability while incarcerated, his susceptibility to artifice, and the likelihood that he will expose incriminating information to others," none of which is relevant to agency); *State* v. *Willis*, supra, 496 S.W.3d 714 (fact of incarceration "do[es] not bear on the question of whether [the informant] was acting as a government agent").[24] The fact that the defendant was in custody when Pladsen elicited the incriminating information from him, although pertinent to whether the statements were deliberately elicited, is simply not relevant to the question of whether Pladsen was an agent of the state.

For these reasons, I see no basis in the record to conclude that Weaver knew or should have known that his meeting with Pladsen or his subsequent telephone call with him; see footnote 20 of this opinion; as opposed to Pladsen's obvious own preexisting desire to provide the police with information in exchange for leniency, was likely to result in Pladsen's seeking further information from the defendant. Accordingly, I would not conclude that Pladsen was a state agent, even under the majority's new formulation of the agency standard.

IV

CONCLUSION

In summary, courts should always scrutinize law enforcement's dealings with jailhouse informants to ensure that the state is not circumventing criminal defendants' sixth amendment rights by "a wink and a nod . . . ." *Ayers* v. *Hudson*, supra, 623 F.3d 312. At the same time, not every encounter between the police and an inmate establishes an agency relationship so as to render inadmissible any incriminating information that the inmate subsequently obtains from the defendant. "[A]ll citizens . . . have a duty to report information about criminal activities, and [although] the [s]ixth [a]mendment may limit the government's ability to *encourage* such reporting behavior, the government should not be required to actively *discourage* such behavior either." (Emphasis in original; internal quotation marks omitted.) *State* v. *Willis*, supra, 496 S.W.3d

713; see also *United States* v. *Johnson*, supra, 4 F.3d 912 ("we decline to handicap legitimate investigations by assuming that any time the government is approached by a would-be informant and eventually uses evidence obtained by that informant, an implicit agency relationship is established"); *United States* v. *Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982) (rejecting argument that "[g]overnment must go to extraordinary lengths to protect defendants from their own loose talk").

Under today's decision, which holds that the trial court was required to find agency even though the state did not affirmatively request information from Pladsen or offer any benefit in exchange for that information, virtually every inmate who seeks out a state official to provide information will be regarded as having become an agent of the state unless the official responds with complete silence or affirmatively dissuades the inmate from seeking further information.[25] See *Thomas* v. *Cox*, supra, 708 F.2d 137 (declining to find agency on basis of single meeting between police and inmate at which no offers or promises were made, because "[t]o do so would be in practical effect to establish the principle that any voluntary proffer of inmate informer assistance not met with silence or actually repudiated by state officials would make inadmissible any inculpatory disclosures . . . subsequently made by an accused," which neither *Henry* nor sixth amendment requires). In my view, this stretches *Massiah* too far.

For the foregoing reasons, I would conclude that the trial court's finding that Pladsen was not acting as an agent of the state is supported by substantial evidence.

Accordingly, I respectfully dissent in part.

[1] I agree with and join parts II and III of the majority opinion.

[2] I have reviewed the numerous other claims of error that the defendant has raised in the present case; see footnote 2 of the majority opinion; and conclude that none of them warrants a reversal of any of his convictions, either because they lack merit, or because they constitute harmless error. With respect to the trial court's improper failure to instruct the jury on third-party culpability; see part III of the majority opinion; I would conclude that, assuming without deciding that such errors are subject to the constitutional harmless error standard; see *State* v. *Arroyo*, 284 Conn. 597, 614, 935 A.2d 975 (2007); the error was harmless beyond a reasonable doubt. The absence of the instruction did not preclude the defendant from advancing his third-party culpability defense, as evidence of third-party culpability—DNA from unknown individuals found on the victim and around her apartment—was admitted into evidence at trial, and defense counsel argued during closing argument that one of these unknown individuals could have killed the victim. Further, the state's case against the defendant was strong. Among other things, the defendant's DNA was found on the vaginal swab taken from the victim and he provided a written, sworn statement to the police in which he confessed in detail to having stabbed and strangled the victim. See footnote 5 of the majority opinion and accompanying text.

[3] After referencing the substantial evidence test, the majority observes in the very next sentence that, "to the extent that the resolution of [the agency] question calls for application of the controlling legal standard to the historical facts, it presents a . . . question of law . . . which [this court reviews] de novo." (Internal quotation marks omitted.) As support for this proposition, the majority quotes *State* v. *Castillo*, 329 Conn. 311, 322–23, 186 A.3d 672 (2018), a decision addressing whether the defendant was in custody for purposes of a fifth amendment claim, which is an issue that, unlike the

issue of agency, has long been recognized as a mixed question of law and fact subject to de novo review.

[4] As a justification for its departure from this court's prior cases, the majority notes that "questions of law abound in [the] context" of an agency analysis. See footnote 19 of the majority opinion. But *Alexander* and its progeny were not incorrect in applying substantial evidence review merely because the question of agency involves the application of a legal standard. Many disputed issues require a legal standard to be applied to underlying facts, yet are not treated as questions of law subject to de novo review. See, e.g., *Ferndale Dairy, Inc.* v. *Geiger*, 167 Conn. 533, 537–38, 356 A.2d 91 (1975) ("it [was] a question of fact to be determined by the jury in applying established legal principles whether the manner in which the [defendant's] car was operated and brought to a stop was the proximate cause of the accident").

[5] There also are federal courts of appeals that, consistent with Connecticut case law, treat the ultimate finding of agency as a question of fact. See *United States* v. *Li*, 55 F.3d 325, 328 (7th Cir. 1995); *United States* v. *Van Scoy*, 654 F.2d 257, 261 (3d Cir.), cert. denied, 454 U.S. 1126, 102 S. Ct. 977, 71 L. Ed. 2d 114 (1981).

[6] The trial court rejected the defendant's claim that Pladsen's testimony at the suppression hearing should be discounted in light of his extensive criminal history and mental health issues. Instead, the trial court observed that his testimony was "intelligent and responsive . . . ." The trial court then found: "[T]he court had sufficient evidence to assess the credibility of Pladsen's hearing testimony, and the court did credit Pladsen's testimony."

[7] The majority's characterization of *Henry* as a case in which the informant "previously had been paid for providing information," fails to adequately capture how clear and indisputable the agency relationship was in that case. The informant in *Henry* had not merely been paid for information in the past; he also was subject to a formal, ongoing agreement with government officials under which he would be compensated if, and only if, he provided information that proved to be favorable. See *United States* v. *Henry*, supra, 270.

[8] See also *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d Cir.) (characterizing *Henry* as concluding that informant was agent "because he was paid and acting under instructions from the government," and noting that *Henry* did not "generalize these factors into a rule defining government agency for future cases" (internal quotation marks omitted)), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999); *Manns* v. *State*, 122 S.W.3d 171, 179 (Tex. Crim. App. 2003) ("[although] not addressing directly what makes an informant a government agent, the [c]ourt's [decision in *Henry*] at least indicates that an informant qualifies if he has a prior arrangement with the government to be paid for obtaining information and is directed in some manner to obtain information from the defendant").

[9] The majority suggests that *Alexander* was overruled by the United States Supreme Court's subsequent decision in *Maine* v. *Moulton*, supra, 474 U.S. 171, which recognized the police's "affirmative obligation" not to circumvent defendants' sixth amendment right to counsel. I disagree. As with *Henry*, *Moulton* involved a clear and indisputable case of agency and was decided solely on the basis of the "deliberate elicitation" prong of *Massiah*. The informant in *Moulton* had entered into an agreement to assist the police in their investigation in exchange for leniency and, acting under police instruction, secretly recorded a series of conversations between him and his codefendant. Id., 163–64. The sole question in that case was whether the informant had not "deliberately elicited" the statements because the codefendant, rather than the informant, had been the one to initiate the conversations. Id., 174–75. Because agency was not at issue, *Moulton* neither overruled nor abrogated this court's discussion of agency principles in *Alexander*. See *Creel* v. *Johnson*, supra, 162 F.3d 393 (defendant's "reliance on *Moulton* [for applicable agency standard] is misplaced because *Moulton*, which involved a clear case of agency, addressed the different issue of whether the prohibition on using undisclosed agents to 'deliberately elicit' information extended to [when] the accused initiates contact with the agent"); *United States* v. *Li*, supra, 55 F.3d 328 (reference in *Moulton* to government's "affirmative obligation" to preserve sixth amendment rights did not affect agency analysis because agency was not at issue); *Commonwealth* v. *Murphy*, 448 Mass. 452, 460, 862 N.E.2d 30 (2007) ("[a]gency was not a contested issue in . . . *Moulton*" (citation omitted)); *State* v. *Willis*, supra, 496 S.W.3d 709 and n.19 (*Moulton* addressed only deliberate elicitation

and was irrelevant to agency); *Manns* v. *State*, 122 S.W.3d 171, 179 (Tex. Crim. App. 2003) ("*Moulton* . . . adds little to the present discussion [regarding agency]").

[10] In addition to concluding that *Alexander* was overruled by *Moulton*; see footnote 9 of this opinion; the majority writes *Alexander* off as being of "limited utility" in the present case because the informant in *Alexander* (1) had not been offered anything in exchange for his cooperation, and (2) was not an inmate. Neither of these factors provides a valid basis for distinguishing *Alexander*. Although it is true that the informant in *Alexander* was offered no reward in exchange for information, the same is true of Pladsen in the present case. Weaver testified that he offered Pladsen no benefits or deals. Similarly, Pladsen testified that Weaver had offered him no benefits and, in fact, told him that he lacked authority to do so, and the trial court credited that testimony. This court cannot second-guess that credibility determination on appeal. See part III of this opinion.

I also disagree that *Alexander* is inapplicable merely because the informant in that case was not an inmate. As I explain more fully in part III of this opinion, courts have consistently recognized that, although the fact of incarceration is relevant to whether the statements were "deliberately elicited," it is not relevant to whether the informant was an agent. See, e.g., *United States* v. *Watson*, supra, 894 F.2d 1347–48.

Moreover, I do not subscribe to the view that the informant in *Alexander* had less of an incentive to cooperate with the police than Pladsen (or the average jailhouse informant) and, thus, could not as easily become an agent of the state, merely because he was not incarcerated. Although inmates have obvious incentives to obtain information from fellow inmates to provide to the police, individuals who are not incarcerated often have strong incentives of their own to cooperate with law enforcement. See *State* v. *Bruneau*, 131 N.H. 104, 110, 552 A.2d 585 (1988) (Souter, J.) (observing that inducement giving rise to agency relationship under *Massiah* "may derive its force from any one of a wide variety of [third-party] interests: the good citizen may respond from a sense of civic obligation, while the common informer may be looking for prosecutorial leniency or even payment in cash"). Indeed, there was evidence that this was especially true of the informant in *Alexander*, who was friends with the missing victim that the defendant had admitted to murdering, and whose visits with the defendant admittedly were "motivated, at least in part, by a feeling of responsibility toward the police." *State* v. *Alexander*, supra, 197 Conn. 182, 187. I would not provide incarcerated defendants with diminished sixth amendment protections merely because the informant who seeks information from them is not a fellow inmate.

[11] The majority cites a number of cases that, in its view, support the proposition that the "must have known" standard from *Henry* governs the agency analysis. I respectfully disagree with the majority's characterization of these cases. Although a number of them discuss *Henry*, none of them holds, as the majority does today, that an informant becomes a government agent merely because the police "must have known" that their conversation with an informant might result in that informant's seeking information from the defendant. Rather, consistent with the case law cited in the body of this opinion, these cases all recognize that the critical inquiry is whether the informant was acting pursuant to an express or implied agreement with police. See *Ayers* v. *Hudson*, 623 F.3d 301, 310–16 (6th Cir. 2010) (observing that agency may be established with evidence of either explicit directive to obtain information or "implied agreement," and concluding that agency had been demonstrated by evidence showing that informant and police "were working in conjunction with each other" to elicit information from defendant); *Randolph* v. *California*, 380 F.3d 1133, 1139, 1144 (9th Cir. 2004) (characterizing *Henry* as case addressing deliberate elicitation prong of *Massiah* and concluding that informant acted as state agent when police had returned him to cell that he shared with defendant after he had met multiple times with state officials to provide incriminating information about defendant, because evidence demonstrated that state "made a conscious decision to obtain [the informant's] cooperation and that [the informant] consciously decided to provide that cooperation"); *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d Cir.) (characterizing decision in *Henry* as case in which informant was found to be agent "because he was paid and acting under instructions from the government," and noting that *Henry* did not "generalize these factors into a rule defining government agency for future cases" (internal quotation marks omitted)), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999); *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993) (holding

that informant was not state agent because government offered no benefit in exchange for informant's cooperation, did not direct informant, and did not assist informant in eliciting statements), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *Depree* v. *Thomas*, supra, 946 F.2d 794 ("[a]t a minimum . . . there must be some evidence that an agreement, express or implied . . . existed"); *Thomas* v. *Cox*, supra, 708 F.2d 137 (admonition by police to informant to "listen but don't ask" does not establish agency "with no express or implicit quid pro quo undergirding it" (internal quotation marks omitted)).

[12] Pladsen testified:

"[Defense Counsel]: When Detective Weaver gave you his business card with the numbers you described, is it correct it was your understanding that if you were to obtain any information about [the defendant] that you were to contact him?

"[Pladsen]: *I don't think that would be a proper way of saying it because that implies that we had some type of an agreement.* What I would say that what [Weaver] did was hey . . . if you want to contact me again, because like I told you some of the time when he was up there we just kind of talked about . . . different things like . . . he was telling me about the Internet because I've never seen the Internet . . . I don't know what that's about. So he was kind of friendly, but it could have been for just a casual conversation. There was nothing implied one way or the other. It's not saying he would come up and b[e] my friend. I'm not saying that either, *but I'm saying it wasn't implied one way or the other. There was no implication and there was no contractual agreement of any sort.*

"[Defense Counsel]: Didn't have a meeting of the minds?

"[Pladsen]: *Right. . . . There's no meeting of the minds, no*." (Emphasis added.)

[13] Likewise, Weaver testified that he made "clear" to Pladsen that he lacked authority to enter into any deals or offer any benefits of any kind.

[14] In this case, the question of whether an officer's instruction to "listen but not ask questions" is sufficient to create an agency relationship is not at issue. Unlike the officer in *Thomas*, Weaver did not instruct Pladsen to listen for information, or to do anything relative to the defendant. Weaver testified that he merely told Pladsen that he "would be willing to listen" to any information Pladsen wanted to provide. The present case thus, presents an even weaker case for agency than the one rejected by the United States Court of Appeals for the Fourth Circuit in *Thomas*. See footnotes 15 and 18 of this opinion.

[15] Any reliance on Weaver's statement that the police were "always interested" in and would "listen" to verifiable information as proof of agency is especially dubious because it is not even clear that Weaver made this statement in reference to information Pladsen might obtain in the future, as opposed to information Pladsen had already obtained but was withholding from Weaver. Weaver testified that he had the impression that Pladsen "knew more" about the victim's murder than he had let on during their meeting.

[16] Even if Pladsen had subjectively believed that any of Weaver's statements constituted requests for information, it is unclear that such a belief, alone, would have created an agency relationship. See *Fairbank* v. *Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011) ("even if [the informant] subjectively believed that the officer's statement [that he was looking for the murder weapon] was a request [for that information], this does not constitute the requisite state involvement"), cert. denied, 565 U.S. 1276, 132 S. Ct. 1757, 182 L. Ed. 2d 558 (2012).

[17] Weaver's admonishment that he lacked authority to provide any deals or benefits evidently had an impact on Pladsen. At the defendant's trial, a few days after the suppression hearing, Pladsen testified:

"[Defense Counsel]: And am I correct that as you sit there now today, you're still hoping for some sort of benefit?

"[Pladsen]: No. [Weaver] made it perfectly clear to me that he's not authorized to do anything of the [sort] on that."

[18] I note that courts have frequently held that, in the absence of an express or implied agreement, generalized instructions to listen for information are insufficient to demonstrate agency. See, e.g., *State* v. *Alexander*, supra, 197 Conn. 186 ("[t]he police had simply asked [the informant] to let them know if he heard anything . . . [and] that request alone did not create an agency relationship"); see also *Thomas* v. *Cox*, supra, 708 F.2d 137 (admonition to

" 'keep your ears' open or to 'listen but don't ask' " was insufficient to establish agency "with no express or implicit quid pro quo undergirding it"). As I have emphasized; see footnote 14 of this opinion; the facts of the present case fall even further short of establishing agency than those at issue in these prior decisions because Weaver did not instruct Pladsen to listen for information (or to do anything at all) but merely said that he generally would be willing to listen to whatever information Pladsen was willing to provide.

[19] The majority relies on the Superior Court's decision in *State* v. *Howell*, Superior Court, judicial district of New Britain, Docket No. CR-05-222048-S (January 30, 2007) (*Sheldon, J.*), but that case is nothing like the present case. First, the Superior Court in *Howell*, as a trial court viewing the evidence on a clean slate, was required to conduct a plenary review of the evidence and independently determine whether the informant was a state agent. In the present case, however, our appellate review of the trial court's finding that Pladsen was not an agent is far more circumscribed, both by the substantial evidence rule and by the trial court's credibility findings. Second, the facts of *Howell* are distinguishable. In *Howell*, during a telephone conversation with the informant, the officer affirmatively instructed the informant to listen to incriminating information the defendant was providing, and *even told the informant that their conversation had made him an agent of the state*. See id. There are no such facts in the present case.

[20] The majority contends that, even if Pladsen had not become a state agent as a result of his January 5, 2007 meeting with Weaver, "surely, such a relationship would have been established after Pladsen offered, and the state affirmatively accepted," the note that Pladsen elicited from the defendant. Footnote 34 of the majority opinion. After Pladsen read the note to Weaver over the telephone, Pladsen was confronted by the defendant, who was angry that Pladsen had given the note to Weaver and asked Pladsen to falsely claim authorship of the note. The majority contends that the elicitation of this statement itself constitutes a *Massiah* violation that independently justifies a reversal of the defendant's convictions. Id. I disagree.

There is no evidence that Weaver said or did anything during that call with Pladsen to suggest that he wanted Pladsen to obtain any additional information from the defendant. Weaver merely accepted the information Pladsen provided to him, which does not establish agency. See *State* v. *Willis*, supra, 496 S.W.3d 712–13 ("[t]he government's willing acceptance of information provided . . . by an . . . informant did not make the informant the government's agent under the [s]ixth [a]mendment" (internal quotation marks omitted)); *Manns* v. *State*, supra, 122 S.W.3d 189 (government's "accept[ance] [of] the information [the informant] had to offer" was insufficient to establish agency).

[21] I respectfully disagree with the majority's suggestion that "Weaver told Pladsen that he was interested in hearing new evidence relating to the victim's death . . . ." I see no evidence of any such statement in the record. Although Weaver asked if Pladsen would be willing to wear a wire sometime in the future should the Office of the State's Attorney authorize such an operation, this is hardly the same thing as telling Pladsen that he himself was "interested in hearing new evidence" about the victim's death. Again, Pladsen's own testimony at the suppression hearing demonstrates he did not interpret Weaver's comment in this manner. See part II of this opinion.

[22] The majority contends that Pladsen's December 27, 2006 letter to Weaver "referenced only unrelated criminal charges." Although the majority is correct in noting that certain other references in the letter concerned unrelated cases; see footnote 30 of the majority opinion; there is no indication that Pladsen's reference to "information that might be very useful" was not related to this case.

[23] I disagree with the majority that the record reflects that Weaver made either of these statements to Pladsen. As to the first statement, Weaver testified that he never mentioned to Pladsen anything about what the Office of the State's Attorney "could or could not do" in terms of approving deals or offering benefits.

As to the second statement, the record is, at best, unclear as to whether Weaver told Pladsen that he would convey any information he received to the Office of the State's Attorney. Pladsen testified that Weaver did not make any such statement. Weaver testified to similar effect but was somewhat equivocal. He testified:

"[Defense Counsel]: Did you indicate to . . . Pladsen that you would report any information you got from him to the [Office of the State's Attorney]?

"[Weaver]: No.

"[Defense Counsel]: Didn't make that clear to him?

"[Weaver]: No. I didn't tell him that, if you tell me something right now, I'm going to go back and tell the [Office of the State's Attorney]. I listened to what he had to say.

"[Defense Counsel]: Isn't it a fact that you indicated to him that any contact you had with him would have to be reported to [the Office of the State's Attorney]?

"[Weaver]: I did tell him that because I wanted to make sure that the [Office of the State's Attorney] knew that I was having contact with someone about an ongoing case they're investigating, so I thought it was important.

"[Defense Counsel]: All right. So you made him generally aware that any contact you had and any information received would go to the [Office of the State's Attorney]?

"[Weaver]: Yes."

[24] Although the Third Circuit Court of Appeals suggested that custody is relevant to the agency analysis in *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 894–95 (3d Cir.), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999), this aspect of *Matteo* has been widely criticized as being based on a misreading of *Henry*. See *United States* v. *Johnson*, supra, 196 F. Supp. 2d 855, 860 (generally relying on *Matteo* but noting that "[t]he court in *Matteo* may have gone too far" when it considered custody as relevant to agency); *Wallace* v. *Price*, supra, 2002 WL 31180963, *68 and n.54 (considering factors relied on in *Matteo* but declining to grant weight to custody); *State* v. *Willis*, supra, 496 S.W.3d 713 n.22 ("We note that the [lower court] correctly cited *Matteo* as stating that [the fact of custody was] pertinent to the question of whether the informant was a government agent. . . . We disagree with this portion of *Matteo*'s analysis, as *Matteo* . . . incorrectly cited *Henry* for the proposition that [this factor was] pertinent to the question of agency, rather than the question of interrogation or deliberate elicitation." (Citation omitted.)).

[25] I endorse the majority's assurance in footnote 24 of its opinion that some affirmative action on the part of the state is necessary in order to establish an agency relationship. I find it difficult, however, to reconcile this assurance with the majority's analysis in the present case, which relies in substantial part on innocuous statements Weaver made to Pladsen, as well as on Weaver's failure to affirmatively dissuade Pladsen from seeking further information.